LANDAU GOTTFRIED & BERGER LLP
MICHAEL I. GOTTFRIED (State Bar No. 146689)
MONICA RIEDER (State Bar No. 263250)
1801 Century Park East, Suite 1460
Los Angeles, California 90067
Telephone: (310) 557-0050
Facsimile: (310) 557-0056
mgottfried@lgbfirm.com
mrieder@lgbfirm.com

Proposed Counsel for Chapter 11
Debtor and Debtor in Possession

UNITED STATES BANKRUPTCY COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>944 MEDIA, LLC,<br><br>        Debtor. | Bk. No. 2:10-23240-AA<br>Chapter 11<br><br>**DEBTOR'S EMERGENCY MOTION FOR ORDER APPROVING (1) INTERIM DEBTOR IN POSSESSION FINANCING, (2) USE OF CASH COLLATERAL, (3) ADEQUATE PROTECTION, AND (4) OTHER RELATED RELIEF, AND SETTING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date:  [Refer to Notice]<br>Time:  [Refer to Notice]<br>Place:  Courtroom 1375<br>          255 E. Temple Street<br>          Los Angeles, CA 90012 |

LANDAU
GOTTFRIED
& BERGER LLP

**TO THE HONORABLE ALAN M. AHART; THE OFFICE OF THE UNITED STATES TRUSTEE; THE DEBTOR'S TWENTY LARGEST UNSECURED CREDITORS; THE DEBTOR'S SECURED CREDITORS; AND OTHER PARTIES ENTITLED TO NOTICE:**

944 Media, LLC (the "Debtor"), hereby moves this Court for an order:

(a) authorizing the Debtor to obtain post-petition financing, on an interim basis, on the terms and conditions provided herein (the "Interim DIP Financing");

(b) authorizing the Debtor to use cash collateral in which Orbitron Holdings, LLC ("Orbitron"), asserts a security interest pursuant to that certain Promissory Note and Security Agreement dated January 2006, as amended from time to time (the "Prepetition Credit Agreement")[1];

(c) authorizing the Debtor to provide adequate protection to Orbitron in connection with the incurrence of indebtedness and the use of cash collateral contemplated herein;

(d) scheduling a final hearing pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure on this Motion within twenty (20) days after the date this Motion is filed, and establishing specified deadlines, procedures and notices in connection with that final hearing; and

(e) providing such other related relief as is necessary to effectuate the agreement between the Debtor and Orbitron as provided herein, and provide security to Orbitron as more fully provided below.

As set forth in further detail below, the terms and conditions of the proposed Interim DIP Financing will allow the Debtor to fund its cash requirements, and to continue its business operations in the ordinary course pending the confirmation of its Plan. The Debtor could not obtain post-petition financing in the form of unsecured credit allowable as an administrative expense under section 503(b)(1)[2], unsecured credit allowable under sections 364(a) or 364(b), or secured credit pursuant to sections 364(c) or (d) on terms and conditions more favorable to the Estate than those

---

[1] A copy of the Prepetition Credit Agreement dated December 22, 2009 that references all prior notes and security agreements between the Debtor and Orbitron is attached as Exhibit "1" to the Declaration of Marc Lotenberg in Support of Emergency First Day Motions (the "Lotenberg Declaration") that is being filed concurrently herewith.
[2] All statutory references are to title 11 of the United States Code (the "Bankruptcy Code") unless otherwise noted.

1  offered by Orbitron.

2      This Motion is based on the Memorandum of Points and Authorities below, the evidence

3  contained in Lotenberg Declaration filed concurrently herewith, the record in this case, and the

4  arguments, evidence and representations that may be presented at or prior to the hearing on this

5  Motion. Pursuant to Local Bankruptcy Rule 9075-1(a)(7), any opposition or objection to the Motion

6  may be presented before or at the time of the hearing on the Motion.

7

8  Dated: April 7, 2010          LANDAU GOTTFRIED & BERGER LLP
9                                       MICHAEL I. GOTTFRIED
                                     MONICA RIEDER

10

11                         By: _____
                               MICHAEL I. GOTTFRIED
12                                Proposed Counsel for 944 Media, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LANDAU
GOTTFRIED
& BERGER LLP

3

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## BACKGROUND

On April 6, 2010 (the "Petition Date"), 944 Media, LLC (the "Debtor"), commenced this case by filing a petition under Chapter 11 of Title 11 of the United States Code. The Debtor commenced operations in 2001, originally publishing a monthly lifestyle and entertainment magazine in Tempe, Arizona. Since then, the Debtor has expanded to ten markets across the country—Atlanta, Dallas, Detroit, Las Vegas, Los Angeles, Miami, Orange County, Phoenix, San Diego, and San Francisco. The Debtor continues to publish the magazine (entitled *944*) on a monthly basis, customizing the issues to feature local personalities, events, clubs, restaurants, fashion, and news in each market. The Debtor also delivers content and creates advertising opportunities through innovative multi-media channels, including weekly electronic newsletters, daily website content, and experiential marketing campaigns. Finally, in conjunction with various marketing partners, the Debtor produces and promotes major events, including events related to the Super Bowl, NBA All-Star Games, the Coachella Valley Music and Arts Festival, and the Sundance Film Festival.

The bankruptcy filing was precipitated by legal issues, including two state court lawsuits filed against the Debtor. One of these cases relates to claims made by a former employee of the Debtor. The other, which is currently before an arbitrator, involves damages sought by the Debtor's former partner in a joint venture created to produce a Super Bowl event. The Debtor plans to resolve the litigation claims through the bankruptcy case and to file a Chapter 11 plan well before the expiration of the exclusivity period. In the meantime, the Debtor will continue to operate its business as a debtor in possession.

Prior to the Petition Date, the Debtor's 51% equity holder Orbitron entered into various loan and security agreements with the Debtor whereby Orbitron loaned approximately $6.7 million (the "Prepetition Credit Agreement"). Under the Prepetition Credit Agreement, Orbitron has a security interest in substantially all of the Debtor's assets. While Orbitron is a 51% equity holder of the Debtor, Orbitron has not been involved in any decisions of the Debtor with respect to the decision to

file for bankruptcy or the terms or approval of the DIP financing.[3] As of the Petition Date, the aggregate outstanding amount owing to Orbitron under the Prepetition Credit Agreement is $9.5 million, consisting of approximately $6.7 million in principal and $2.8 million in accrued and unpaid interest.

## II.

## EMERGENCY NEED FOR FINANCING

This Motion is brought on an emergency basis in light of the immediate and irreparable harm that would be suffered by the Debtor and its estate if the Debtor was denied the financing that is required to sustain its ongoing business. Attached as Exhibit "5" to the Declaration of Marc Lotenberg in Support of Emergency First Day Motions (the "Lotenberg Declaration") filed concurrently herewith is a spreadsheet showing the Debtor's cash flow projections (the "Cash Flow Projections"). The Cash Flow Projections demonstrate that the Debtor will require access to the emergency loan in the amount of $250,000 to fund its operations and critical expenditures within the first thirty days following the Petition Date.

It is imperative that the Debtor obtain the financing necessary to continue its business operations. If the Debtor is not allowed to do so, it will rapidly lose the goodwill that it has established with its customers, printers and advertisers, and the value of its business will deteriorate dramatically. In order to operate the business, the Debtor needs sufficient cash to continue to pay its employees, and to otherwise satisfy its basic, post-petition operating expenses, such as rent and utilities. Moreover, because Orbitron has a lien on all accounts, inventory and proceeds, among other things, the cash received by the Debtor in the days and weeks after the Petition Date will constitute cash collateral.

The availability of post-petition financing and the use of cash collateral are critical to the Debtor's on-going business activities including, most importantly, the costs and expenses of printing, publishing and distributing the *944* magazine. Moreover, absent sufficient cash to meet its

---

[3] Eric and Tim Crown, who indirectly own 100% of the equity in Orbitron and who were former members of the Debtor's Board of Directors, resigned their position as members of the Board of Managers on or about March 25, 2010. Since that time, all decisions of the Debtor concerning its future, including the decision to file for bankruptcy have been made by the Debtor's sole managing member and other current employees and officers of the Debtor.

payroll obligations, the Debtor will likely incur a mass exodus of its employees, without whom it cannot effectively and efficiently continue operations.

In recognition of the vital and urgent need for new financing, the Debtor attempted to obtain credit from multiple sources including JP Morgan Chase Bank (where the Debtor currently has its bank accounts) and other private investors. However, due to the pending litigation against the Debtor, and the general difficulty in obtaining financing during this time in the economy, the Debtor could not obtain financing from these sources, and does not believe that it would be possible to obtain financing on terms better than those being provided by Orbitron as provided herein. The Debtor believes that the proposed financing is the best and only alternative for the Debtor at this time.

Based upon its pre-petition efforts, and in light of its existing debt structure, the Debtor concluded that it is unable to obtain unsecured credit allowable only as an administrative expense in this case, or to obtain secured credit on terms and conditions more favorable than the terms and conditions provided herein. The Debtor and Orbitron were each represented by counsel and negotiated the terms of the proposed DIP financing at arms' length.

### III.

### SUMMARY OF THE ESSENTIAL TERMS OF THE INTERIM DIP FINANCING AND AGREEMENT REGARDING THE DEBTOR'S USE OF CASH COLLATERAL

Orbitron has (a) agreed to provide the Debtor with financing in the total amount of $400,000, with interim financing of $250,000 upon entry of an Interim Order, and (b) authorized the Debtor's use of cash collateral, on the terms and conditions provided by the Summary of Terms and Conditions (the "Financing Agreement") attached hereto as Exhibit "A." The Debtor believes that the terms and conditions of the financing are reasonable under the circumstances of this case. As required by Local Bankruptcy Rule 4001-2(b) the Debtor hereby is identifying the following provisions that normally are not granted in connection with interim financing:

(1) Local Bankruptcy Rule 4001-2(b)(2) requires identification of provisions that bind the estate or all parties in interest with respect to the validity, perfection, or amount of the secured creditor's prepetition lien or debt or the waiver of claims against the secured

creditor. Here, while the Debtor is agreeing to the validity, enforceability and unavoidability of Orbitron's liens, security interests and claims, this agreement is without prejudice to the rights of any authorized party (other than the Debtor) to investigate and challenge any such liens, security interests and/or claims of Orbitron, or to assert any other claims or causes of action, at law or in equity against Orbitron (a "<u>Third Party Challenge</u>"); <u>provided</u> that any such Third Party Challenge not made by commencement of an adversary proceeding pursuant to Bankruptcy Rule 7001 and served no later than 75 days after the Petition Date or 60 days following the formation of the Committee, whichever is later, shall be forever barred.

 (2) <u>Local Bankruptcy Rule 4001-2(b)(3)</u> requires identification of any provisions that waive or limit the estate's rights under section 506(c) of the Bankruptcy Code. Here, Orbitron is requesting such waiver only in connection with the entry of a Final Order.

 (3) <u>Local Bankruptcy Rule 4001-2(b)(4)</u> requires identification of any provisions that prime any secured lien. Here, Orbitron is requesting a priming lien only in connection with its own pre-petition loans and specifies that its first-priority liens is subject to "valid and perfected liens arising prior to and existing on the Petition Date and other permitted liens to be mutually agreed upon other than the liens of the DIP Lender."

IV.

**ARGUMENT**

**A.    Approval of the DIP Financing, Including Granting the DIP Lender a Priming Lien Under 11 U.S.C. § 364, is Appropriate Here.**

 Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business and (c) obtaining credit with specialized priority or security. *See* 11 U.S.C. § 364. If a debtor in possession cannot obtain post-petition credit on an unsecured basis, the Court may authorize the obtaining of credit or the incurring of debt, repayment of which is entitled to either superpriority administrative expense status, a lien on unencumbered property, a junior lien on encumbered property, or a combination of the foregoing. 11 U.S.C. §364(c). Additionally, the Court may

authorize a debtor to obtain post-petition credit secured by a senior or equal lien on an already encumbered property (i.e., a "priming" lien) where a debtor is unable to obtain credit elsewhere and the interest of the existing lienholder is adequately protected. 11 U.S.C. § 364(d); *see also In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 630-31 (S.D.N.Y. 1990) (unsuccessful attempts to secure financing from other sources justified senior priority lien under § 364).

Here, all of the Debtor's property is subject to the perfected security interest of Orbitron under the Prepetition Credit Agreement and related documents. Without the ability to grant priming liens, the Debtor does not have sufficient unencumbered property to support a post-petition financing facility large enough to fund the Debtor's working capital needs during the reorganization process. Moreover, as previously discussed, the Debtor does not believe that it could obtain financing on any terms better than those provided by Orbitron. *See, e.g., In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (debtor not required to seek credit without senior lien from every possible lender before concluding that such credit is unavailable); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (debtor demonstrated unavailability of unsecured financing by approaching four lending institutions); *In re Dunes Casino Hotel*, 69 B.R. 784, 791 (Bankr. D.N.J. 1986) (debtor made the required effort under § 364(d)(1) based on evidence that the debtor had unsuccessfully attempted to borrow funds on an unsecured basis or secured by junior liens, but that at least three such lenders were willing to advance funds secured by a superpriority lien); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (fact that two national banks refused to grant unsecured loans was sufficient to support conclusion that § 364(d)(1) requirement was met).

Under the circumstances, there is no reasonable basis to believe that the Debtor could have located a different postpetition lender offering terms more favorable than Orbitron. Rather, the Debtor's management took the necessary steps, in the exercise of its best business judgment, in negotiating the DIP Facility that is presently before the Court, and the Debtor believes that Orbtiron's proposal may be the best – and only – alternative available.[4]

---

[4] Courts routinely defer to the debtor's business judgment on most business decisions, such as the decision to borrow money. *See In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) (stating that "[b]usiness judgments should be left to the board room and not to this Court"); *In re Lifeguard Indus, Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same); *In re Curlew Valley Assocs.*, 14 B.R. 506 511-12 (Bankr. D. Utah 1981) (holding that so long as the trustee can articulate valid business reasons for conduct, the court will not intercede). "More exacting scrutiny would

The other terms and conditions of the post-petition loan also are fair and reasonable, and thus should be approved on an interim and final basis in their entirety. The purpose of the loan is to enable the Debtor to maintain the value of the estate while pursuing all possible strategies for maximizing value for creditors and, ultimately, successful emergence from the chapter 11 case.

Finally, the post-petition loan is the product of extensive arms-length, good faith negotiations between the Debtor and Orbitron.

**B.    The Debtor's Use of Cash Collateral Under 11 U.S.C. § 363 is Appropriate.**

Section 363(c)(2) of the Bankruptcy Code provides, in relevant part, that the Debtor may not use, sell or lease cash collateral unless "[e]ach entity that has an interest in such cash collateral consents; or ... the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c) (2) (A) & (B). Here, Orbitron has agreed to the consensual use of its cash collateral by the Debtor as provided by the Financing Agreement, the terms and conditions of which are discussed above.

**C.    Immediate Interim Relief Is Appropriate.**

Bankruptcy Rule 4001(c) permits a court to approve on an interim basis a debtor's request for financing during the 14 day period following the filing of a motion requesting authorization to obtain post-petition financing, "only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(c) (2). In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. *See, e.g., Simasko*, 47 B.R. at 449 (deferring to the debtor's business judgment as to necessary financing); *Ames Dep't Stores*, 115 B.R. at 38 (holding that debtor may exercise business judgment in this context consistent with their fiduciary duties).

Here the Debtor's need for access to the DIP Financing and the use of cash collateral is immediate and urgent. These funds are critical to the Debtor's survival and ability to move forward with a plan of reorganization.

---

slow the administration of the debtor's estate and increase its costs, interfere with Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985). Courts generally will not second guess a debtor in possession's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the Code." *Curlew Valley Assocs.*, 14 B.R. at 513-14.

In short, the Debtor cannot wait for the beneficial effects of the DIP Financing, but rather, any delay could have the same impact as a denial of this Motion. Because the Debtor's business operations will be irreparably harmed, to the detriment of their estate, creditors, and other parties in interest, absent immediate financial assistance as requested herein, the Debtor seeks to have the terms of the financing approved on an interim basis pending a final hearing.

## V.

## CONCLUSION

For the reasons stated above, the Debtor respectfully requests that the Court enter an order (a) authorizing the Debtor to obtain post-petition financing, use Orbitron's cash collateral, and provide Orbitron with adequate protection, and (b) scheduling a final hearing on debtor in possession financing within 20 days, as requested in the Motion.

Dated: April 7, 2010

LANDAU GOTTFRIED & BERGER LLP
MICHAEL I. GOTTFRIED
MONICA RIEDER

By: _____
MICHAEL I. GOTTFRIED
Proposed Counsel for 944 Media, LLC

# EXHIBIT A

# 944 MEDIA, LLC
## Summary of Terms and Conditions
## Proposed $400,000 Senior Secured, Super-Priority
## Debtor in Possession Credit Facility

*This Summary of Terms and Conditions ("Summary") shall not be considered to be exhaustive as to the final terms and conditions that govern any potential financing arrangements. In the event of a conflict between the provisions of this Summary and the relevant Agreement, the latter shall govern. This document and all matters related thereto are confidential as between the Borrower and its financial and legal advisors; except for disclosure required pursuant to securities laws, the Borrower and DIP Lender each agree to, and each agrees to cause its financial and legal advisors to, maintain the confidentiality of this document and such matters unless written authorization to the contrary is provided in advance of any non-authorized disclosure. All amounts are in United States dollars.*

| | |
|---|---|
| *Borrower:* | 944 Media, LLC (the "Borrower"). |
| *Lender:* | Orbitron Holdings, LLC (the "DIP Lender"). |
| *Financing:* | After entry of the Final Order, a revolving credit line (the "DIP Facility") of up to $400,000 (the "DIP Commitment"). "*Final Order*" means the final order of the bankruptcy court having jurisdiction over the Debtor's Chapter 11 case (the "Bankruptcy Court"), that, without limitation, approves the DIP Facility and grants the liens and security interests contained therein, on terms reasonably satisfactory to the DIP Lender. |
| *Interim Availability:* | $250,000 of the DIP Commitment shall be made available to Borrower from the date of the entry of the Interim Order until the date of the entry of the Final Order. "*Interim Order*" means an interim order of the Bankruptcy Court authorizing Borrower, among other things, to obtain interim financing and incur post-petition indebtedness on terms reasonably satisfactory to the DIP Lender. |
| *DIP Availability:* | After entry of the Final Order, Borrower may submit to DIP Lender no later than the 7th day of each month a funding request and an updated budget for its operating expenses, an updated 13 week cashflow statement, and other financial information as may be reasonably requested by DIP Lender, in form and substance reasonably acceptable to DIP Lender (the "Financial Reports"). So long as an Event of Default has not occurred, and so long as the Financial Reports submitted by Borrower do not deviate 5% or more from the budget approved by the Bankruptcy Court, DIP Lender will advance $50,000 on the fourteenth day of each month to Borrower (such amount hereinafter referred to as the "DIP Availability"). DIP Lender may increase the amount of a monthly advance in its sole and absolute discretion, and shall never be required to fund more than $50,000 in any one month. For the avoidance of doubt, the DIP Lender shall not be required |

Exhibit A

to fund any monthly advances to Borrower before May 14, 2010.

*Use of Proceeds:* The DIP Financing will be used to fund (i) post-petition operating expenses and working capital needs of the Borrower; (ii) professional fees pursuant to Sections 327, 330, and 331 of the Bankruptcy Code (defined below); (iii) other fees and expenses incurred by Borrower in connection with its Chapter 11 case; and (iv) any other costs and expenses of the Debtor, all as set forth in a budget reasonably acceptable to DIP Lender and to be approved by the Bankruptcy Court, and provided further that the Borrower's actual expenses and payments do not deviate from the budget by 5% or more.

*Termination Date:* All DIP Commitments shall be deemed terminated, and DIP Lender will have no further obligation to provide financing pursuant to the DIP Facility on the earliest to occur of: (i) six (6) months following the Petition Date; (ii) acceleration by DIP Lender of the obligations under the DIP Facility due to the occurrence and continuation of an Event of Default (as shall be defined in the DIP Facility); (iii) the effective date of a confirmed plan of reorganization that provides for payment in full of all obligations owing under the DIP Facility or is otherwise acceptable to DIP Lender; (iv) the date which is the closing date of any sale of all or substantially all of Borrower's assets; (v) the entry of an Order by the Bankruptcy Court granting relief from the automatic stay permitting foreclosure of any assets of the Borrower, or (vi) the entry of an order of dismissal or conversion of the Borrower's Chapter 11 case, or the appointment of an examiner with expanded powers. The date on which the earliest of clauses (i) through (vi) above occurs being referred to hereinafter as the "Termination Date". Except as provided in (iii) above, all unpaid principal and interest on the DIP Facility will be due and payable in full on the Termination Date.

*Interest Rate:* Interest on amounts outstanding under the DIP Facility will be 15% per annum. All interest will be computed on the basis of 360-day year for the actual number of days elapsed and all interest payments will accrue on the first day of each month.

*Default Interest Rate:* Interest Rate plus 2.0% per annum.

*Priority:* Amounts owed by Borrower to the DIP Lender pursuant to the DIP Facility including all accrued interest, fees, costs and expenses will constitute, in accordance with Section 364(c)(1) of the Bankruptcy Code, a claim having priority over any or all administrative expenses of the kind specified in, among other sections, Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b) and 726 of the Bankruptcy Code but subject and subordinate to, priority for payment of the fees and expenses of Borrower's professionals and quarterly trustee fees payable under 28 U.S.C. §1930, in the amount of $30,000 (the "Carveout"); provided however, that priority of the claims of

**Exhibit A**

|  |  |
|---|---|
| | DIP Lender to any proceeds of, or recoveries under, avoidance actions available to the bankruptcy estate of Borrower pursuant to the Bankruptcy Code (to the extent these claims are pursued, the "Avoidance Actions") shall attach *pari passu* with other administrative claimants. |
| *Collateral:* | The DIP Facility, including accrued interest, fees, costs and expenses shall be secured, subject to Carveouts, adequate protection payments, and senior claims, pursuant to Section 364(d) of the Bankruptcy Code, by "*super-priority*" liens and security interests in all of the Borrower's property in which the DIP Lender has a lien or claim on or security interest in on the Petition Date, which shall be senior to the lien of the DIP Lender; provided however that the DIP Facility shall not be secured by proceeds of, or recoveries under, Avoidance Actions. |
| | In addition, the DIP Facility, including accrued interest, costs and expenses, shall be secured in accordance with sections 364(c)(2) and (3) of the Bankruptcy Code by first priority liens (the "Priming Lien") on and security interests in all of Borrower's existing and future acquired property and interests of any nature whatsoever, real and personal, tangible and intangible, including without limitation accounts receivable, general intangibles, payment intangibles, supporting obligations, investment property, commercial tort claims, inventory, rolling stock, machinery, equipment, subsidiary capital stock, chattel paper, documents, instruments, deposit accounts, contract rights and tax refunds of the Borrower (collectively, together with any collateral upon which liens exist on the Petition Date, the "Post-Petition Collateral"), subject only to valid and perfected liens arising prior to and existing on the Petition Date and other permitted liens to be mutually agreed upon *other than* the liens of the DIP Lender ("Prior Permitted Liens"). |
| *Adequate Protection:* | Borrower will provide the following adequate protection to DIP Lender: (i) any Borrower obligations owing under the pre-petition financing provided to Borrower by DIP Lender will be secured by a second priority, valid, enforceable, perfected, and unavoidable replacement and additional lien on all of the Borrower's collateral that arises after the petition date, subject only to the Priming Lien and the Carveout (the "Lender Lien"); (ii) the accrual of interest under the DIP Facility. |
| *Documentation:* | The DIP Facility shall be subject to the negotiation, execution and delivery of a definitive loan agreement and related pledges, security documents and other supporting instruments and agreements embodying the terms set forth herein reasonably satisfactory to Borrower and DIP Lender, and each of the foregoing shall contain terms and conditions customary in debtor-in-possession financing agreements, consistent with Borrower's rights and obligations as debtor-in-possession. |
| *Affirmative and Negative* | Affirmative and negative covenants contained in the Pre-Petition |

**Exhibit A**

| | |
|---|---|
| *Covenants:* | Facility to the extent such covenants are customarily included in debtor-in-possession financing agreements. |
| *Conditions Precedent to Funding:* | There shall exist no Event of Default (or event which would constitute an Event of Default with the giving of notice or lapse of time) under any of the loan documents entered into in connection with the DIP Facility and the representations and warranties therein shall be true and correct in all material respects. |
| | There shall have occurred no material adverse change in the Borrower's condition (financial, environmental, or otherwise), operations, performance, properties or prospects since the date of this Summary, that in the reasonable judgment of the DIP Lender, has or can reasonably be expected to have a material adverse effect on the rights and remedies of DIP Lender or on the ability of the Borrower to perform its obligations to them. |
| | Compliance with Bankruptcy Rule 4001 and the entry of the Interim Order and the Final Order, together with any other order requested by DIP Lender authorizing and approving the DIP Facility in form, substance and amount and providing for the Post-Petition Collateral, all acceptable to DIP Lender in its sole discretion. |
| *Conditions Precedent to Closing:* | The closing of the DIP Facility shall be subject to the following conditions: |

- Execution of definitive loan documents in for and content reasonably acceptable to DIP Lender and satisfaction of all conditions to be set forth therein.

- Entry of an Interim Order approving the DIP Facility, its superpriority status and all first priority and other liens securing the DIP Facility and containing such other orders and findings as DIP Lender may request, which Interim Order shall not have been modified or amended without reasonable approval of the DIP Lender, and shall not have been reversed or stayed pending appeal, in form and substance satisfactory to the DIP Lender.

- An acknowledgement by Borrower of the amount, validity, enforceability and non-avoidability of the claims and liens created under DIP Lender's pre-petition financing of Borrower, and a release and waiver by Borrower of any claims against the DIP Lender and its employees, advisors, attorneys, agents and representatives, provided, however, that the Borrower's agreement as to the validity, enforceability and unavoidability of DIP Lender's liens, security interests and claims is without prejudice to the rights of any authorized party (other than the Borrower) to investigate and challenge any such pre-petition liens, security interests and/or claims of DIP Lender, or to assert any other claims or causes of action, at law or in equity

**Exhibit A**

|  |  |
|---|---|
|  | against DIP Lender (a "Third Party Challenge"); provided that any such Third Party Challenge not made by commencement of an adversary proceeding pursuant to Bankruptcy Rule 7001 (an "Adversary Proceeding") and served no later than 75 days after the Petition Date or 60 days following the formation of the Committee, whichever is later (the "Third Party Challenge Period"), shall be forever barred. |
| *Conditions Subsequent:* | Entry of a Final Order by the Bankruptcy Court within 30 days of the Petition Date, which Final Order shall not have been modified or amended without approval of the DIP Lenders, and shall not have been reversed or stayed pending appeal, which Final Order shall be in form and substance reasonably satisfactory to the DIP Lender. |
| *Cash Collateral* | Borrower shall no longer be able to use the cash collateral of the Lender if (a) a condition to borrowings under the DIP Facility is not met, (b) an Event of Default occurs under the DIP Facility, or (c) the DIP Facility expires by its terms. |
| *Events of Default:* | Defaults and Events of Default customarily included in debtor-in-possession financing agreements, including, without limitation: |

- The Chapter 11 Case shall be converted to a case under Chapter 7 of the Bankruptcy Code or be dismissed.

- Filing or support of a proposed plan of reorganization by Borrower that does not provide for the payment in full and in cash of Borrower's obligations outstanding under the DIP Facility.

- Entry of a final order confirming a plan of reorganization that does not require repayment of the DIP Facility as of the effective date of the plan.

- Appointment of a trustee under Section 1104 of the Bankruptcy Code, or appointment of an examiner with expanded powers.

- Entry of a final order by the Bankruptcy Court amending, supplementing, staying, vacating or otherwise modifying the DIP Facility, the Interim Order or Final Order approving the DIP Facility without the written consent of the DIP Lender.

- The Final Order shall provide that any attempt by Borrower to obtain, or if any other party in interest obtains, an order of the Bankruptcy Court invalidating, reducing or otherwise impairing any of DIP Lenders' claims, or to subject DIP Lenders' collateral to a material surcharge pursuant to Section 506(c) of the Bankruptcy Code.

- Borrower shall apply for an order substituting any assets for all or any portion of the Post-Petition Collateral, except as provided in the instruments evidencing and governing the

**Exhibit A**

|  |  |
|---|---|
|  | DIP Facility. |
|  | ♦ Failure to make all payments under the DIP Facility when due, subject to any applicable grace period. |
|  | ♦ Failure to pay any undisputed, material post-petition taxes or indebtedness. |
|  | ♦ Breach of any covenant of the DIP Facility, after adjustment for any applicable grace periods. |
|  | ♦ Failure of the Debtor to comply with the terms of the Budget approved by the Court. |
|  | ♦ Other Events of Default customary in debtor-in-possession financing agreements. |
| *Governing Law:* | This Summary and all definitive documentation are to governed by the laws of the State of California without reference to conflict of law principles, and any disputes, litigation or legal proceedings arising between or among the parties hereunder or thereunder shall be subject to the exclusive jurisdiction of the federal and state courts located in the State of California. |

**Exhibit A**

PHOENIX/471576.1

16