1
LANDAU GOTTFRIED & BERGER LLP
MICHAEL I. GOTTFRIED (State Bar No. 146689)
2
MONICA RIEDER (State Bar No. 263250)
1801 Century Park East, Suite 1460
3
Los Angeles, California 90067
Telephone: (310) 557-0050
4
Facsimile: (310) 557-0056
mgottfried@lgbfirm.com
5
mrieder@lgbfirm.com

6
Proposed Counsel for Chapter 11
Debtor and Debtor in Possession
7

8
UNITED STATES BANKRUPTCY COURT

9
FOR THE CENTRAL DISTRICT OF CALIFORNIA

10
LOS ANGELES DIVISION

11

12
In re

13
944 MEDIA, LLC,

14
                    Debtor.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Bk. No. 2:10-23240-AA
Chapter 11

**DECLARATION OF MARC LOTENBERG IN SUPPORT OF EMERGENCY FIRST DAY MOTIONS**

Date:  [Refer to Notice]
Time:  [Refer to Notice]
Place: Courtroom 1375
       255 E. Temple Street
       Los Angeles, CA 90012

LANDAU
GOTTFRIED &
BERGER LLP

I, Marc Lotenberg, hereby declare as follows:

1. I have personal knowledge of the facts set forth below and, if called to testify, I could and would competently testify thereto.

2. On April 6, 2010 (the "Petition Date"), 944 Media, LLC (the "Debtor"), filed a voluntary petition under Chapter 11 of the Bankruptcy Code.

3. I am the Chief Executive Officer of the Debtor. I founded the Debtor in 2001 and I have acted as the Debtor's CEO since 2001. Through my company ML Media, Inc., I also hold a 48.98% ownership interest in the Debtor.

4. Orbitron Holdings, LLC ("Orbitron"), holds the remaining 51.02% interest in the Debtor.

5. The Debtor commenced operations in 2001, originally publishing a monthly lifestyle and entertainment magazine in Tempe, Arizona. Since then, the Debtor has expanded to ten markets across the country—Atlanta, Dallas, Detroit, Las Vegas, Los Angeles, Miami, Orange County, Phoenix, San Diego, and San Francisco. The Debtor's operational headquarters are in Los Angeles, California, and the Debtor maintains offices in each of its regional markets.

6. The Debtor continues to publish a lifestyle and entertainment magazine, entitled *944*, on a monthly basis, customizing the issues to feature local personalities, events, clubs, restaurants, fashion, and news in each market. Through a non-traditional targeted controlled distribution platform, including more than 5,000 strategic distribution locations and placement in 35,000 luxury hotel rooms nationwide, *944* has an audited circulation of approximately 3.4 million copies per year. GAME, the Debtor's custom annual sports publication, is published annually and distributed in three major cities.

7. The Debtor also delivers content and creates advertising opportunities through innovative multi-media channels, including weekly electronic newsletters, mobile applications, daily website content, and experiential marketing campaigns. The Debtor's website, 944.com, attracts more than 2.5 million unique viewers each month.

8. In conjunction with various marketing partners, the Debtor produces and promotes major events, including events related to the Super Bowl, NBA All-Star Games, the Coachella

LANDAU
GOTTFRIED
& BERGER LLP

1    Valley Music and Arts Festival, and the Sundance Film Festival.  The Debtor is also frequently

2    involved in charity events, including the production of a recent high-profile photography

3    exhibition in Miami to benefit the charity Hope for Haiti.

4        9.  The Debtor has approximately $1.8 million in assets.  The Debtor leases all of its

5    office space and does not own any real property.

6        10.  Prior to the Petition Date, Orbitron and the Debtor entered into a Promissory Note

7    and Security Agreement dated January 2006, as amended from time to time (the "Prepetition

8    Credit Agreement").  Under the Prepetition Credit Agreement, Orbitron loaned approximately

9    $6.7 million to the Debtor and received a security interest in substantially all of the Debtor's

10   assets.  A copy of the Promissory Note and Security Agreement dated December 22, 2009, which

11   references all prior notes, is attached hereto as Exhibit "1."  As of the Petition Date, the

12   aggregate outstanding amount owed to Orbitron under the Prepetition Credit Agreement is $9.5

13   million, consisting of approximately $6.7 million in principal and $2.8 million in interest.

14       11.  Apart from its secured debt to Orbitron, the Debtor has approximately $300,000 in

15   secured debt owed to various parties in connection with equipment leases, each loan being

16   secured by the relevant equipment.  The Debtor also has approximately $3.9 million in unsecured

17   debt, the majority ($2.4 million) of which is owed to the Debtor's primary printing company,

18   Creel Printing & Publishing Company, Inc.

19       12.  The bankruptcy filing was precipitated by legal issues, including two state court

20   lawsuits filed against the Debtor.  One of these cases relates to claims made by a former

21   employee of the Debtor.  The other, which is currently before an arbitrator, involves damages

22   sought by the Debtor's former partner in a joint venture created to produce a Super Bowl event.

23   The Debtor plans to resolve the litigation claims through the bankruptcy case and to file a

24   Chapter 11 plan well before the expiration of the exclusivity period.  In the meantime, the Debtor

25   will continue to operate its business as a debtor in possession.

26       13.  I believe the Debtor has excellent prospects for reorganization.  The Debtor's

27   business model is fundamentally sound and the Debtor has a proven record of success at

28   reaching a highly desirable segment of the market, specifically, affluent, trend-savvy consumers

1   between the ages of 21 and 38. *944* has an audited circulation of approximately 3.4 million

2   copies per year, and advertising revenues average over $1,000,000 per month. Further, the

3   Debtor generates additional revenue from special events. The Debtor's recent struggles were due

4   partially to a decline in the advertising market, linked to the overall economic recession, and

5   partially to the litigation in which the Debtor has been embroiled. I believe the Chapter 11 case

6   will permit the Debtor to resolve the litigation finally and efficiently and to move forward with

7   increased capacity to take advantage of the rebound in the advertising market.

8       14. I make this declaration in support of the following emergency motions for "first day"

9   relief (the "Emergency Motions"), filed concurrently herewith:

10         a. *Debtor's Emergency Motion for Order Extending Time to File Schedules*

11         *of Assets and Liabilities and Statement of Financial Affairs;*

12         b. *Debtor's Emergency Motion for Order Determining Adequate Assurance of*

13         *Payment for Postpetition Utility Services;*

14         c. *Debtor's Emergency Motion for Authority to (1) Pay Pre-Petition Wages and*

15         *(2) Honor Accrued Vacation and Leave Benefits;* and

16         d. *Debtor's Emergency Motion for Order Approving (1) Interim Debtor in*

17         *Possession Financing, (2) Use of Cash Collateral, (3) Adequate Protection, and*

18         *(4) Other Related Relief, and Setting a Final Hearing Pursuant to Bankruptcy*

19         *Rule 4001.*

20   I have reviewed each of the Emergency Motions and believe that the relief sought in each of

21   them is essential to ensuring the uninterrupted operation of the Debtor's business and to the

22   Debtor's successful reorganization.

23       <u>Schedules and Statement of Financial Affairs</u>

24       15. The Debtor was required to file this bankruptcy case on an expedited basis due to an

25   impending deadline in arbitration proceedings to which the Debtor is a party. The Debtor

26   retained its proposed bankruptcy counsel, Landau Gottfried & Berger LLP, only one week prior

27   to the Petition Date, and the Debtor's limited accounting staff has been working overtime to

28   provide Debtor's counsel with the information necessary for the petition and first-day motions.

16. During the first few weeks of the bankruptcy case, the Debtor will be working extremely hard to (a) coordinate the efforts of its employees in ten offices across the country; (b) ensure that *944*, the Debtor's magazine publication, is printed and delivered on time (which is critical to the Debtor's revenue stream); (c) maintain relationships with advertisers; (d) respond to the inquiries of employees, vendors, landlords, and other creditors and interested parties; and (e) comply with the administrative requirements of the United States Trustee, including the preparation and filing of the Debtor's 7-Day Package, and the Court.

17. Under these circumstances, it will be extremely difficult for the Debtor to complete its schedules of assets and liabilities (the "Schedules") and statement of financial affairs (the "SOFA") carefully, thoroughly, and accurately within 14 days. If the Debtor had to file its Schedules and SOFA in the first two weeks of this case it is likely that they would contain errors and omissions, despite the best efforts of the Debtor and its counsel, and the Debtor would later need to amend them.

18. I do not believe that any of the Debtor's creditors will be prejudiced by the extension of the deadline for the Debtor to file its Schedules and SOFA from April 20, 2010 to May 20, 2010. The Debtor already has been in informal communications with many of its creditors, has issued a press release regarding the case, and will continue to be responsive to requests for information.

19. This motion should be heard on an emergency basis because the default deadline for filing the Schedules and SOFA occurs extremely quickly, and the Debtor needs to know immediately whether it must devote its resources in the first two weeks of the case to preparation of the Schedules and SOFA.

### Utilities

20. At its various offices, the Debtor receives utility services, including telephone, internet, water, and electricity, from a number of utility providers (the "Utility Providers"). Attached hereto as Exhibit "2" is a list setting forth, on an account-by-account basis, the name and address of each Utility Provider, the type of utility services furnished by the Utility Provider, the Debtor's account number with the Utility Provider, and the Debtor's average monthly

1  payment to the Utility Provider.

2      21.  The continued operation of each of the Debtor's offices, which is necessary to

3  support the distribution of *944* to each market, is dependent upon continued provision of water

4  and electricity to those offices.  Further, loss of telephone and internet service would cripple the

5  Debtor's business, both because the geographically remote offices remain in contact primarily

6  through electronic communications, and because a substantial portion of the Debtor's content is

7  delivered via the internet.  Accordingly, uninterrupted utility service is essential to the survival of

8  the Debtor's business and the prospect of a successful reorganization.

9      22.  The Debtor proposes to provide "adequate assurance of payment" to each Utility

10  Provider by making cash deposits for each account in an amount equal to half of the Debtor's

11  average monthly payment on that account.  The proposed adequate protection amounts are also

12  listed in the chart attached as Exhibit "2."

13      23.  This motion should be heard on an emergency basis because the Debtor must provide

14  adequate assurance of payment to the Utility Providers within the first 30 days after the Petition

15  Date or risk termination of utility services.  Because uninterrupted utility service is critical to the

16  Debtor's business, it is imperative that the means of providing adequate assurance to the

17  Debtor's Utility Providers be determined immediately.

18                          <u>Wages and Vacation and Leave Benefits</u>

19      24.  The Debtor currently employs approximately 70 individuals (the "Employees"), who

20  work in the Debtor's corporate office in Los Angeles, California, and in the Debtor's regional

21  offices in each of the local *944* markets.  A complete list of the current Employees is attached

22  hereto as Exhibit "3."

23      25.  The Employees are compensated with a combination of salary, commissions,

24  insurance benefits, and/or reimbursement of business expenses (collectively, "Wages").  All

25  Employees are full-time salaried employees and they are paid semi-monthly, on the first and the

26  sixteenth of each month.  Salaries are paid on a current basis through the date of payroll.  In

27  addition to salaries, many of the Debtor's Employees receive 5-15% commissions based on the

28  amount of revenue generated.  All commissions earned during a particular month are paid with

LANDAU
GOTTFRIED
& BERGER LLP

the payroll on the sixteenth of the following month. Further, certain Employees are entitled to have approved business expenses reimbursed by the Debtor, including parking, airfare, hotel, taxi, meal, and entertainment expenses. Reimbursements occur on the next payroll date following submission and approval of the expense report.

26. The Debtor pays part of the cost for medical insurance for its Employees. (Vision and dental insurance is also available to Employees, but the Debtor does not contribute to the cost.) The Debtor pays the premiums for the medical insurance, as well as its workers' compensation insurance premiums, by remitting the necessary amount to its payroll company, DHR, with each semi-monthly payroll. In the normal course of its relationship with DHR, the Debtor transfers the funds necessary for the payment of that period's Wages to DHR approximately 48 hours before the payroll date. DHR then pays the insurance premiums and transfers the Employees' salary, commissions, and expenses to the Employees by direct deposit.

27. On April 1, 2010, the Debtor paid Wages to its Employees for the period from March 16, 2010 through March 31, 2010. The total amount of Wages paid on April 1, 2010, was approximately $160,000.

28. On April 16, 2010, the Debtor will owe the following amounts to its Employees:

a. salary for the period from April 1, 2010 through April 15, 2010, of which the salary for four working days (April 1, April 2, April 5, and April 6) will constitute a pre-petition obligation;

b. commissions for the month of March, all of which will constitute a pre-petition obligation;

c. reimbursement of any approved business expenses for which reports are submitted prior to April 5, 2010, and subsequently approved by the Debtor, all of which will constitute a pre-petition obligation; and

d. medical and workers' compensation insurance premiums for the period from April 1, 2010 through April 15, 2010, of which the insurance premiums for four working days (April 1, April 2, April 5, and April 6) will constitute a pre-petition obligation.

LANDAU
GOTTFRIED
& BERGER LLP

29. The Debtor estimates that the total payroll obligations due on April 16, 2010, including all payroll taxes, will be approximately $210,000 (approximately $100,000 of which will be for pre-petition claims, comprising $59,000 for four days' salary and insurance plus $40,000 in accrued commissions for March). The foregoing amount will need to be transferred to DHR no later than 48 hours prior to April 16, 2010.

30. In addition to making the above-described payments on account of pre-petition claims as part of its April 16, 2010 payroll, the Debtor seeks authority to reimburse its Employees for approved business expenses incurred pre-petition when they are presented for payment according to the Debtor's usual business practices. The Debtor believes that the amount of any outstanding reimbursable expenses is less than $2,000.

31. Most of the Debtor's Employees have accrued PTO ("paid time off," which includes both vacation and sick leave) hours. A chart of the accrued PTO hours for each Employee is attached hereto as Exhibit "4." Except as required by state law, the Debtor's future policy will be to permit Employees to use these PTO hours at their discretion, but not to pay out unused PTO hours when an Employee leaves the Debtor's employment.

32. The Debtor cannot continue to operate and has no chance at a successful reorganization without the continued presence and dedicated efforts of its Employees, particularly in the critical first few weeks of the case. The Debtor's success depends on maintaining relationships with advertisers, who interact primarily with the Debtor's sales representatives in each market. Advertising revenues depend heavily on the timely publication of *944*, particularly since many of the advertisements in the magazine are for events that are happening on a particular date. Delaying the publication of *944* even once will harm the Debtor's business; failure to publish an issue might destroy it. The Debtor cannot produce and print the magazine without the ongoing efforts of its Employees.

33. If the Debtor fails to honor its wage and benefit obligations to the Employees, it is likely that many of them will quit, crippling the Debtor's business. Accordingly, it is vital that the Debtor be able to continue paying Wages and providing benefits to its Employees without interruption.

34. All Employees with pre-petition claims the Debtor seeks to pay through its *Emergency Motion for Authority to (1) Pay Pre-Petition Wages and (2) Honor Accrued Vacation and Leave Benefits* (the "Employee Motion") are listed on Exhibit "3" and are still employed by the Debtor.

35. The Employees are aware that the Debtor has filed a Chapter 11 case and they have been assured that the Debtor will endeavor to honor all wage and leave benefit obligations to them. If the Employees do not receive their Wages and leave benefits, many of them will likely quit. As noted above, the Debtor cannot afford to miss even a single month of publication, so it would be impossible for the Debtor to replace any Employees who left in time to avoid irreparable harm to the Debtor's business (without even considering the loss of talent and experience the Debtor would suffer if any of its current Employees left). Accordingly, I believe that making the payments outlined in the Employee Motion is necessary for the Debtor to continue operations and reorganize successfully.

36. The procedures proposed in the Employee Motion will permit the Debtor to retain its Employees and honor its obligations with minimal disturbance to the Debtor's ordinary operating procedures. The large majority of the payments described in the Employee Motion will be made with the regular April 16, 2010 payroll. The remaining expense reimbursements (which the Debtor believes will not exceed $2,000) will be paid in accordance with the Debtor's usual business practices. Finally, Employees will be able to use their PTO just as they would have pre-petition. All of these measures will ease the transition to Chapter 11 for both the Debtor and the Debtor's Employees.

37. For the reasons stated in paragraph 13 above, I believe the Debtor has excellent prospects for reorganization.

38. I am the only Employee who is also an insider. I have a pre-petition claim for four days' salary, which will be paid if the Employee Motion is granted. Beginning with the Petition Date, all of my compensation will be disclosed in Notices of Insider Compensation.

39. The claims the Debtor seeks to pay through the Employee Motion would all be priority claims under 11 U.S.C. § 507(a)(4) or (a)(5). That is, they are all claims held by the

1    Debtor's Employees for "wages, salaries, or commissions, including vacation . . . and sick leave

2    pay" or "contributions to an employee benefit plan" arising from services rendered within the

3    180 days prior to the Petition Date. Further, the Employee Motion does not provide for the

4    payment of more than $10,950 in value to any Employee on account of pre-petition claims.

5        40. Payment of the amounts described in the Motion will not render the Debtor

6    administratively insolvent. The total amount of money to be paid and value to be given on

7    account of pre-petition claims under the Motion is approximately $140,000 ($59,000 for pre-

8    petition salary and insurance + $40,000 for March commissions + the equivalent of $36,000 in

9    accrued PTO hours). The Debtor expects to receive over $750,000 in deposits in the month of

10   April and anticipates receiving $250,000 in interim debtor in possession financing within the first

11   two weeks of the case.

12       41. This motion should be heard on an emergency basis because, as described above, the

13   loss of employees would be devastating to the Debtor's business. Further, the large majority of

14   the payments the Debtor seeks to make under the motion will be due on April 16, 2010, and the

15   necessary funds must be transmitted to the Debtor's payroll service approximately 48 hours

16   before the payroll date.

17                      Debtor in Possession Financing and Cash Collateral

18       42. Attached as Exhibit "5" hereto is a spreadsheet showing the Debtor's cash flow

19   projections (the "Cash Flow Projections"). The Cash Flow Projections demonstrate that the

20   Debtor will require access to an emergency loan in the amount of $250,000 to fund its operations

21   and critical expenditures within the first thirty days following the Petition Date. In order to

22   operate, the Debtor needs sufficient cash to pay its employees, satisfy basic expenses such as rent

23   and utilities, and fund the printing, publication, and distribution of *944*.

24       43. If the Debtor does not receive the immediate financing necessary to continue its

25   business operations and to publish *944* on time, it will rapidly lose the goodwill that it has

26   established with its customers and advertisers, and the value of its business will deteriorate

27   dramatically. Accordingly, I believe the Debtor's business will suffer immediate and irreparable

28   harm if the Debtor does not receive the proposed debtor in possession financing on an interim

1 | basis pending a final hearing.

2 |      44. The Debtor has entered into an agreement with Orbitron under which Orbitron will

3 | provide approximately $400,000 in debtor in possession (DIP) financing, subject to the approval

4 | of the Bankruptcy Court.

5 |      45. While Orbitron holds 51.02% of the equity in the Debtor, Orbitron has not been

6 | involved in any of the Debtor's decisions regarding the decision to file for bankruptcy or the

7 | terms of the DIP financing. Eric and Tim Crown, who indirectly own 100% of the equity in

8 | Orbitron, resigned their positions as members of the Debtor's Board of Directors on or around

9 | March 25, 2010. Since that time, all decisions of the Debtor concerning its future, including the

10 | decision to file for bankruptcy, have been made by me, as the Debtor's sole director, and by

11 | other current employees of the Debtor.

12 |      46. In recognition of the vital and urgent need for new financing, I contacted JP Morgan

13 | Chase Bank and other private investors to seek financing. I was unable to obtain post-petition

14 | financing from these sources, due in part to the pending litigation against the Debtor and to the

15 | generally tight credit market. Accordingly, I believe the proposed financing is the best and only

16 | alternative for the Debtor at this time.

17 |      47. Based upon my pre-petition efforts to secure financing, and in light of the Debtor's

18 | existing debt structure, I believe that it is impossible to obtain unsecured credit allowable only as

19 | an administrative expense in this case, or to obtain secured financing on terms and conditions

20 | more favorable than the terms and conditions provided by Orbitron (which are set forth in

21 | Exhibit "A" to the *Debtor's Emergency Motion for Order Approving (1) Interim Debtor in*

22 | *Possession Financing, (2) Use of Cash Collateral, (3) Adequate Protection, and (4) Other*

23 | *Related Relief, and Setting a Final Hearing Pursuant to Bankruptcy Rule 4001*).

24 |      48. The Debtor and Orbitron were each represented by counsel and negotiated the terms

25 | of the proposed debtor in possession financing at arm's length.

26 | / / /

27 | / / /

28 | / / /

1    49. The motion should be heard on an emergency basis because the Debtor does not have

2    the funds to operate for the next two weeks without the $250,000 to be provided by Orbitron as

3    interim debtor in possession financing.

4         I declare under penalty of perjury under the laws of the United States of America that the

5    foregoing is true and correct.

6         Executed this 7 day of April, 2010, at _Los Angeles_, California.

7

8                                                    _____
                                                        Marc Lotenberg
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LANDAU
GOTTFRIED
& BERGER LLP

EXHIBIT 1

## PROMISSORY NOTE
## AND SECURITY AGREEMENT

**DATE:**            December 22, 2009

**MAKER:**           **944 MEDIA LLC, an Arizona limited liability company ("Maker")**

**PAYEE:**            **ORBITRON HOLDINGS, L.L.C., an Arizona limited liability company ("Payee")**

**GUARANTOR:**      **ML MEDIA, INC., a Nevada corporation ("Guarantor")**

**PRINCIPAL
AMOUNT OF
PROMISSORY NOTE:**     **ONE HUNDRED THOUSAND DOLLARS ($100,000)**

## RECITALS

A.     Maker is currently indebted to Payee pursuant to that certain Amended and Restated Promissory Note by Maker in favor of Payee in the original principal amount of One Million Dollars ($1,000,000), dated January __, 2006 (the "January 2006 Note");

B.     Maker is also currently indebted to Payee pursuant to that certain Promissory Note and Security Agreement by Maker in favor of Payee in an original principal amount of Fifty Five Thousand Dollars ($55,000), dated May 10, 2006 (the "May 2006 Note");

C.     Maker is also currently indebted to Payee pursuant to that certain Promissory Note and Security Agreement by Maker in favor of Payee in an original principal amount of up to Three Hundred Fifty Thousand Dollars ($350,000), dated July __, 2006 (the "July 2006 Note");

D.     Maker is also currently indebted to Payee pursuant to that certain Promissory Note and Security Agreement by Maker in favor of Payee in the original principal amount of up to Five Hundred Thousand Dollars ($500,000), dated October __, 2006 (the "October 2006 Note");

E.     Maker is also currently indebted to Payee pursuant to that Certain Promissory Note and Security Agreement by Maker in favor of Payee in the original principal amount of Two Hundred Fifty Thousand Dollars ($250,000), dated December __, 2006 (the "December 2006 Note");

F.     Maker is also currently indebted to Payee pursuant to that certain Promissory Note and Security Agreement by Maker in favor of Payee in the original principal amount of Two Hundred Fifty Thousand Dollars ($250,000), dated December 27, 2006 (the "Second December 2006 Note");

G.     Maker is also currently indebted to Payee pursuant to that certain Promissory Note and Security Agreement by Maker in favor of Payee in the original principal amount of Two Hundred Thousand Dollars ($200,000), dated January 26, 2007 (the "January 2007 Note");

Exhibit 1

H.    Maker is also currently indebted to Payee pursuant to that certain Promissory Note and Security Agreement by Maker in favor of Payee in the original principal amount of Two Hundred Fifty Thousand Dollars ($250,000), dated February 15, 2007 (the "First February 2007 Note");

I.    Maker is also currently indebted to Payee pursuant to that certain Promissory Note and Security Agreement by Maker in favor of Payee in the original principal amount of Two Hundred Thousand Dollars ($200,000), dated February 28, 2007 (the "Second February 2007 Note");

J.    Maker is also currently indebted to Payee pursuant to that certain Promissory Note and Security Agreement by Maker in favor of Payee in the original principal amount of Two Hundred Fifty Thousand Dollars ($250,000), dated March 16, 2007 (the "First March 2007 Note");

K.    Maker is also currently indebted to Payee pursuant to that certain Promissory Note and Security Agreement by Maker in favor of Payee in the original principal amount of Two Hundred Thousand Dollars ($200,000), dated March 28, 2007 (the "Second March 2007 Note");

L.    Maker is also currently indebted to Payee pursuant to that certain Promissory Note and Security Agreement by Maker in favor of Payee in the original principal amount of Three Hundred Thousand Dollars ($300,000), dated April 13, 2007 (the "First April 2007 Note").

M.    Maker is also currently indebted to Payee pursuant to that certain Promissory Note and Security Agreement by Maker in favor of Payee in the original principal amount of Three Hundred Thousand Dollars ($300,000), dated April 23, 2007 (the "Second April 2007 Note");

N.    Maker is also currently indebted to Payee pursuant to that certain Factoring Agreement by Maker in favor of Payee in the original principal amount Two Hundred Fifty Thousand Dollars ($250,000), dated June 14, 2007 (the "Factoring Agreement");

O.    Maker is also currently indebted to Payee pursuant to that certain Promissory Note and Security Agreement by Maker in favor of Payee in the original principal amount of Three Hundred Thousand Dollars ($300,000), dated August 30, 2007 (the "August 2007 Note");

P.    Maker is also currently indebted to Payee pursuant to that certain Promissory Note and Security Agreement by Maker in favor of Payee in the original principal amount of Nine Hundred Fifty Thousand Dollars ($950,000), dated October 19, 2007 (the "October 2007 Note");

Q.    Maker is also currently indebted to Payee pursuant to that certain Promissory Note and Security Agreement by Maker in favor of Payee in the original principal amount of Two Hundred Thousand Dollars ($200,000), dated March 13, 2008 (the "First March 2008 Note");

R.    Maker is also currently indebted to Payee pursuant to that certain Promissory Note and Security Agreement by Maker in favor of Payee in the original principal amount of Two Hundred Thousand Dollars ($200,000), dated March 24, 2008 (the "Second March 2008 Note");

Exhibit 1

Promisso                                        nber 22, 2009)

S.      Maker is also currently indebted to Payee pursuant to that certain Promissory Note and Security Agreement by Maker in favor of Payee in the original principal amount of Seven Hundred Thousand Dollars ($700,000), dated May 5, 2008 (the "May 2008 Note");

T.      Maker is also currently indebted to Payee pursuant to that certain Promissory Note and Security Agreement by Maker in favor of Payee in the original principal amount of One Hundred Thousand Dollars ($100,000), dated October 19, 2009 (the "October 2009 Note");

U.      The January 2006 Note, the May 2006 Note, the July 2006 Note, the October 2006 Note, the First December 2006 Note, the Second December 2006 Note, the January 2007 Note, the First February 2007 Note, the Second February 2007 Note, the First March 2007 Note, the Second March 2007 Note, the First April 2007 Note, the Second April 2007 Note, the Factoring Agreement, the August 2007 Note, the October 2007 Note, the First March 2008 Note, the Second March 2008 Note, the May 2008 Note and the October 2009 Note each remain in full force and effect; and

V.      Maker has requested that Payee make available to Maker additional funds and Payee has agreed to the foregoing request of the Maker upon the terms and conditions stated herein.

## AGREEMENT

In consideration of Payee advancing One Hundred Thousand Dollars ($100,000) to Maker in accordance with the terms of this Promissory Note, Maker promises and agrees to pay, without presentment, demand, protest or notice of any kind all of which are hereby expressly waived, to Payee, or order, at Payee's offices at 9330 S. Priest Drive, Tempe, Arizona 85284, or at such other place as the holder hereof may from time-to-time designate, the principal sum of all monies advanced to Maker under this Promissory Note together with all interest and other sums owing under this Promissory Note, to be paid as follows:

1.      **OUTSTANDING NOTES.** The Maker acknowledges that the January 2006 Note, the May 2006 Note, the July 2006 Note, the October 2006 Note, the First December 2006 Note, the Second December 2006 Note, the January 2007 Note, the First February 2007 Note, the Second February 2007 Note, the First March 2007 Note, the Second March 2007 Note, the First April 2007 Note, the Second April 2007 Note, the Factoring Agreement, the August 2007 Note, the October 2007 Note, the First March 2008 Note, the Second March 2008 Note, the May 2008 Note and the October 2009 Note are each in full force and effect upon the terms and conditions contained therein.

2.      **FIXED INTEREST**. Fixed interest ("Fixed Interest") shall accrue on the unpaid balance of this Promissory Note at a rate equal to twelve percent (12%) per annum (the "Fixed Rate"). The Fixed Interest provided herein shall be calculated for the actual number of days the principal is outstanding on the basis of a 360-day year and compounded daily.

3.      **EFFECTIVE RATE OF INTEREST.** Maker agrees to an effective rate of interest that is the Fixed Interest as stated above plus any additional interest resulting from any other charges in the nature of interest paid or to be paid by or on behalf of Maker, or any benefit received or to be received by Payee or any holder, in connection with this Promissory Note.

**4.    DEFAULT INTEREST.** Payments of principal and any other amounts not paid when due bear default interest at a rate equal to twenty-five percent (25%) (the "Default Rate") per annum. The Default Rate provided herein shall be calculated for the actual number of days the principal is outstanding on the basis of a 360-day year and compounded daily.

**5.    PAYMENTS.**

**(a)**    Fixed Interest shall be payable quarterly in arrears on January 22, April 22, July 22 and October 22 of each year, commencing on January 22, 2010, unless such day is not a Business Day, in which case Fixed Interest shall be payable on the next succeeding Business Day.

**(b)**    The principal balance outstanding hereunder, together with accrued but unpaid Fixed Interest and any other amounts due and owing to Payee pursuant to this Promissory Note shall be due and payable on December 22, 2012 (the "Maturity Date"), unless such day is not a Business Day, in which case the Maturity Date shall be the next succeeding Business Day.

**6.    TERM.** The term of this Promissory Note (the "Term") shall begin on December 22, 2009 and shall end on December 22, 2012.

**7.    FORM OF PAYMENTS.** All amounts owing hereunder shall be payable in lawful money of the United States of America in immediately available funds.

**8.    CREDITING OF PAYMENTS.** Any payments made hereunder shall be credited first to any accrued charges as described herein then to principal and then to accrued interest. Any accrued and unpaid charges or interest shall be added to the principal on a daily basis and thereafter shall accrue interest at the rate provided herein.

**9.    REPRESENTATIONS AND WARRANTIES.** Maker make the following representations and warranties which shall be true, correct, and complete in all respects as of the date hereof and as of any future date on which any amounts are outstanding under this Promissory Note:

**(a)    Location of Chief Executive Office.** The chief executive office of Maker is located at the location of 4253 N. Scottsdale Rd., #200, Scottsdale, AZ 85251.

**(b)    Due Organization and Qualification.** Maker is duly organized and existing and in good standing under the laws of the jurisdiction of its incorporation and qualified and licensed to do business in that jurisdiction and in each other jurisdiction in which the conduct of its business would require it to be qualified and licensed to do business.

**(c)    Due Authorization; No Conflict.**

**(i)**    The execution, delivery, and performance by Maker of this Promissory Note has been duly authorized by all necessary corporate action.

**(ii)**    The execution, delivery, and performance by Maker of this Promissory Note does not and will not (i) violate any provision of federal, state, provincial or local law or regulation applicable to it or any order issued by any court or regulatory body having

jurisdiction over Maker, (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation or material lease, (iii) result in or require the creation or imposition of any Lien of any nature whatsoever upon any properties or assets, or (iv) require any approval or consent of any Person under any material contractual obligation.

(iii)    The execution, delivery, and performance by Maker of this Promissory Note does not and will not require any registration with, consent, or approval of, or notice to, or other action with or by, any federal, state, provincial, foreign, or other Governmental Authority or other Person.

(iv)    This Promissory Note, and all other documents contemplated hereby, when executed and delivered by Maker will be the legally valid and binding obligations of Maker, enforceable against Maker in accordance with their respective terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

(v)    The Liens granted by Maker to Payee in and to its properties and assets pursuant to this Promissory Note are validly created, perfected and are first-priority Liens subordinate to no other Liens on such properties and assets, except for those Liens created by the January 2006 Note, the May 2006 Note, the July 2006 Note, the October 2006 Note, the First December 2006 Note, the Second December 2006 Note, the January 2007 Note, the First February 2007 Note, the Second February 2007 Note, the First March 2007 Note, the Second March 2007 Note, the First April 2007 Note, the Second April 2007 Note, the Factoring Agreement, the August 2007 Note, the October 2007 Note, the First March 2008 Note, the Second March 2008 Note, the May 2008 Note and the October 2009 Note.

(d)    **Litigation**.  There are no actions or proceedings pending, by or against Maker before any court or administrative agency, and Maker has no knowledge of any pending, threatened, or imminent litigation, governmental investigations, or claims, complaints, actions, or prosecutions involving Maker.

10.    **AFFIRMATIVE COVENANTS**.  Maker covenants and agrees that, until full and final payment of this Promissory Note, and unless Payee shall otherwise consent in writing, Maker shall do all of the following:

(a)    **Taxes**.  Cause all assessments and taxes, whether real, personal, or otherwise, due or payable by, or imposed, levied, or assessed against it or any of its property to be paid in full, before delinquency or before the expiration of any extension period.

(b)    **No Setoffs or Counterclaims**.  Make payments hereunder without setoff or counterclaim and free and clear of, and without deduction or withholding for or on account of, any federal, state, or local taxes.

(c)    **Compliance with Laws**.  Comply with the requirements of all applicable laws, rules, regulations, and orders of any governmental authority, including the Fair Labor Standards Act and the Americans With Disabilities Act, other than laws, rules, regulations, and

orders the non-compliance with which, individually or in the aggregate, would not have and could not reasonably be expected to have a Material Adverse Change.

(d)     **Leases; Expenses.** Pay when due all rents and other amounts payable under any leases to which it is a party or by which its properties and assets are bound. Pay all expenses in accordance with prior customary business practices, which shall include the manner and order of payments.

(e)     **Financial Information.** Keep true and correct financial books and records, using generally accepted accounting principles consistently applied, or such other accounting principles as Payee in its reasonable judgment may find acceptable from time to time. Maker must provide Payee, upon request or demand, within two Business Days of Payee's request financial statements in form and content acceptable to Payee, including copies of tax returns or any other information concerning Maker's affairs and properties as Payee may request.

(f)     **Maintenance of Equipment.** Maintain the Equipment in good operating condition and repair (ordinary wear and tear excepted), and make all necessary replacements thereto so that the value and operating efficiency thereof shall at all times be maintained and preserved. Other than those items of Equipment that constitute fixtures on the date hereof, Maker shall not permit any item of Equipment to become a fixture to real estate or an accession to other property, and such Equipment shall at all times remain personal property.

(g)     **Insurance.**

(i)     At Maker's expense, keep the Collateral insured against loss or damage by fire, theft, explosion, sprinklers, and all other hazards and risks, and in such amounts, as are ordinarily insured against by other owners in similar businesses. Maker shall also maintain business interruption, public liability, product liability, and property damage insurance relating to Maker's ownership and use of the Collateral, as well as insurance against larceny, embezzlement, and criminal misappropriation.

(ii)     All such policies of insurance shall be in such form, with such companies, and in such amounts as may be reasonably satisfactory to Payee.

(h)     **Operation of Business.** Operate the Business in a commercially reasonable manner, consistent with the operation of like or similar businesses.

11.     **NEGATIVE COVENANTS.** Maker covenants and agrees that, until full and final payment of this Promissory Note, Maker shall not do any of the following without Payee's prior written consent:

(a)     **Indebtedness.** Except for regular and systematic expenses incurred in the ordinary course of business, create, incur, assume, permit, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any Indebtedness, in excess of One Hundred Thousand Dollars ($100,000) in the aggregate, except Indebtedness owing to Payee.

(b)  **Liens.** Create, incur, assume, or permit to exist, directly or indirectly, any Lien on or with respect to any of its property or assets, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom.

(c)  **Restrictions on Fundamental Changes.** Enter into any merger, consolidation, reorganization, amalgamation, arrangement or recapitalization, or reclassify its capital stock, or liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution).

(d)  **Disposal of Assets.** Convey, sell, lease, assign, transfer, or otherwise dispose of, in one transaction or a series of transactions, any of its properties or assets.

(e)  **Change Name/Location.** Change its name, corporate structure, or identity, or add any new fictitious name or change the state where it is located.

(f)  **Guarantee.** Guarantee or otherwise become in any way liable with respect to the obligations of any third Person.

(g)  **Nature of Business.** Make any change in the principal nature of its business, including, but not limited to, affiliating with any other organization or Person or entering into a joint venture, strategic partnership or any other relationship with any Person.

(h)  **Change of Control.** Cause, permit, or suffer, directly or indirectly, any change of control in ownership or management of Maker.

(i)  **Investments.** Directly or indirectly make, acquire, or incur any liabilities (including contingent obligations) for or in connection with (a) the acquisition of the securities (whether debt or equity) of, or other interests in, a Person, (b) loans, advances, capital contributions, or transfers of property to a Person, or (c) the acquisition of all or substantially all of the properties or assets of a Person.

(j)  **Suspension.** Suspend or go out of a substantial portion of its business.

(k)  **No Prohibited Transactions Under ERISA.** Directly:

(i)  engage in any prohibited transaction which is reasonably likely to result in a civil penalty or excise tax described in Sections 406 of ERISA or 4975 of the IRC for which a statutory or class exemption is not available or a private exemption has not been previously obtained from the Department of Labor;

(ii)  permit to exist with respect to any Benefit Plan any accumulated funding deficiency (as defined in Sections 302 of ERISA and 412 of the IRC), whether or not waived;

(iii)  fail to pay timely required contributions or annual installments due with respect to any waived funding deficiency to any Benefit Plan;

(iv)  terminate any Benefit Plan where such event would result in any liability of Orbitron Holdings, LLC or any ERISA Affiliate under Title IV of ERISA;

    **(v)**    fail to make any required contribution or payment to any Multiemployer Plan;

    **(vi)**    fail to pay any required installment or any other payment required under Section 412 of the IRC on or before the due date for such installment or other payment;

    **(vii)**    amend a Plan resulting in an increase in current liability for the plan year such that either of Maker or any ERISA Affiliate is required to provide security to such Plan under Section 401(a)(29) of the IRC; or

    **(viii)**    withdraw from any Multiemployer Plan where such withdrawal is reasonably likely to result in any liability of any such entity under Title IV of ERISA;

which, individually or in the aggregate, results in or reasonably would be expected to result in a claim against or liability of Maker or any ERISA Affiliate in excess of Fifty Thousand Dollars ($50,000).

    **(l)**    **Limitation on Transactions with Affiliates.** Enter into any transaction, including without limitation, any purchase, sale, lease or exchange of property, the rendering of any service or the payment of any management, advisory or similar fees, with any Affiliate unless such transaction is in the ordinary course of business and upon fair and reasonable terms no less favorable than it would obtain in a comparable arm's length transaction with a Person which is not an Affiliate.

    **(m)**    **Distributions.** Except for distributions to members for tax purposes, permit any Person to withdraw capital invested in Maker or to receive distributions from Maker in respect of any ownership or equity interest prior to the payment in full of the entire unpaid principal balance of this Promissory Note together with all accrued interest and other charges.

    **(n)**    **Payments to Affiliates.** Pay or permit to be paid to any Affiliate, including, without limitation, family members of Marc Lotenberg ("Lotenberg"), any amount, salary, bonus, incentive compensation, fee, payment or distribution in excess of One Hundred Twenty-Five Thousand ($125,000) per year in the aggregate.

    **(o)**    **Use of Funds.** Use the funds advanced pursuant to this Promissory Note for any personal or non-business purpose.

    **(p)**    **Personal Funds.** Use accounts of the Business to record personal or non-business funds, expenses or transactions, or fund personal expenses through the operations of the Business.

    **12.**    **ADDITIONAL COVENANTS.** In addition to the Covenants made by Maker in Sections 10 and 11 hereto, Maker covenants and agrees that, until full and final payment of this Promissory Note, Maker shall not do any of the following without Payee's prior consent which shall be deemed given by Payee if Payee fails to object to such action in any manner communicated to Maker within four (4) Business Days following written notice by Maker to Payee. For the purposes of this Section 12, written notice by Maker to Payee shall be delivered at the following e-mail address: eric@azcrown.com with a carbon copy to matt@azcrown.com:

(a)    **Capital Expenditure.**  Purchase or agree to purchase any capital expenditure in excess of Twenty-five Thousand Dollars ($25,000).

(b)    **Business Activities.**  Except for regular and systematic business operations (as currently conducted), undertake any new business venture, one-time or systematic business event, one-time or systematic business opportunity, which in the aggregate may result in expenses or revenue in excess of Ten Thousand Dollars ($10,000) in the aggregate.

13.    <u>**EVENTS OF DEFAULT.**</u>  The occurrence of any one or more of the following events shall constitute an "Event of Default" hereunder, and upon such Event of Default, Payee may, in Payee's sole and absolute discretion, accelerate this Promissory Note by declaring in a written notice to Maker that the then entire outstanding principal sum hereof, together with all unpaid interest and other amounts payable hereunder, is immediately due and payable and may exercise any and all rights and remedies available at law or in equity, including, without limitation, selling or otherwise disposing of the Collateral as provided under the Uniform Commercial Code. All sums owing under this Promissory Note shall be immediately due and payable upon an occurrence of an Event of Default set forth in <u>Section 13(h)</u> hereof:

(a)    Nonpayment of principal, interest or other amounts when the same shall become due and payable hereunder;

(b)    The failure of Maker to comply with any provision, condition, covenant or agreement of this Promissory Note;

(c)    The occurrence of any Material Adverse Change in the condition (financial or otherwise) of Maker or any person or entity who is or may become liable hereunder;

(d)    Any statement, representation or warranty contained herein shall be false; or

(e)    The occurrence of a default or an event of default after the date hereof under any agreement, note or instrument evidencing any Indebtedness of Maker or under any guarantee relating to any Indebtedness of Maker;

(f)    The failure of Maker to comply with any provision of any document, instrument or agreement executed in connection with the indebtedness evidenced hereby or any security document securing the indebtedness evidenced by this Promissory Note;

(g)    The making by Maker or any other person or entity who is or may become liable hereunder of an assignment for the benefit of its creditors; and

(h)    The appointment of (or application for appointment of) a receiver of Maker or any other person or entity who is or may become liable hereunder, or the involuntary filing against or voluntary filing by Maker, or any other person or entity who is or may become liable hereunder, of a petition or application for relief under federal bankruptcy law or any similar state or federal law, or the issuance of any writ of garnishment, execution or attachment for service with respect to Maker or any person or entity who is or may become liable hereunder, or any property of Maker or property of any person or entity who is or may become liable hereunder.

(i)     As long as Lotenberg is an officer or employee of Maker, (i) the commission by Lotenberg of any crime involving moral turpitude, (ii) the commission by Lotenberg of any act or the suffering by Lotenberg of any occurrence or state of facts which in the sole determination of Payee adversely affects or could reasonably be expected to adversely affect Lotenberg's and/or the Maker's business reputation (including without limitation, the commission of a felony) or (c) the perpetration by Lotenberg of a fraud or crime against the Maker.

## 14.     RIGHTS AND REMEDIES.

(a)     Upon the occurrence, and during the continuation, of an Event of Default Payee may, at its election, without notice of its election and without demand, do any one or more of the following, all of which are authorized by Maker:

(i)     Declare all obligations evidenced by this Promissory Note, or otherwise, immediately due and payable which shall occur automatically without action by Payee upon an Event of Default specified in Section 13(h);

(ii)     Cease advancing money or extending credit to or for the benefit of Maker under any other note or agreement between Maker and Payee;

(iii)     Terminate this Promissory Note or any other note or agreement between Maker and Payee as to any future liability or obligation of Payee, but without affecting Payee's rights and security interests in the Collateral and without affecting the obligations under this Promissory Note;

(iv)     Pursue any of Payee's rights and remedies provided for in this Promissory Note, any other agreement with Maker, or any of Payee's rights and remedies under applicable law;

(v)     Settle or adjust disputes and claims directly with Account Debtors for amounts and upon terms which Payee considers advisable and enforce Maker's rights against the Account Debtors, and in such cases, Payee will credit the obligations owing under this Promissory Note with only the net amounts received by Payee in payment of such disputed Accounts after deducting all Payee's expenses incurred or expended in connection therewith;

(vi)     Without notice to or demand upon Maker, make such payments and do such acts as Payee considers necessary or reasonable to protect its security interests in the Collateral. Maker agrees to assemble the Collateral if Payee so requires, and to make the Collateral available to Payee as Payee may designate. Maker authorizes Payee to enter the premises where the Collateral is located, to take and maintain possession of the Collateral, or any part of it, and to pay, purchase, contest, or compromise any encumbrance, charge, or Lien that in Payee's determination appears to conflict with its security interests and to pay all expenses incurred in connection therewith. With respect to Maker's owned or leased premises, Maker hereby grants Payee a license to enter into possession of such premises and to occupy the same, without charge, in order to exercise any of Payee's rights or remedies provided herein, at law, in equity, or otherwise;

10

(vii)    Without notice to Maker (such notice being expressly waived), and without constituting a retention of any collateral in satisfaction of an obligation (within the meaning of Section 9-620 of the Arizona Uniform Commercial Code), set off and apply to the obligations under this Promissory Note any and all (i) balances and deposits of Maker held by Payee, or (ii) Indebtedness at any time owing to or for the credit or the account of Maker held by Payee;

(viii)    Hold, as cash collateral, any and all balances and deposits of Maker held by Payee, to secure the full and final repayment of all of the obligations under this Promissory Note;

(ix)    Ship, reclaim, recover, store, finish, maintain, repair, prepare for sale, advertise for sale, and sell (in the manner provided for herein) the Collateral. Payee is hereby granted a license or other right to use, without charge, Maker's labels, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks, service marks, and advertising matter, or any property of a similar nature, as it pertains to the Collateral, in completing production of, advertising for sale, and selling any of the Collateral and Maker's rights under all licenses and all franchise agreements shall inure to Payee's benefit;

(x)    Sell the Collateral at either a public or private sale, or both, by way of one or more contracts or transactions, for cash or on terms, in such manner and at such places (including Maker's premises) as Payee determines is commercially reasonable. It is not necessary that the Collateral be present at any such sale;

(xi)    Payee shall give notice of the disposition of the Collateral as follows:

•    Payee shall give Maker and each holder of a security interest in the Collateral who has filed with Payee a written request for notice, a notice in writing of the time and place of public sale, or, if the sale is a private sale or some other disposition other than a public sale is to be made of the Collateral, then the time on or after which the private sale or other disposition is to be made;

•    The notice shall be personally delivered or mailed, postage prepaid, to Maker at least 5 Business Days before the date fixed for the sale, or at least 5 Business Days before the date on or after which the private sale or other disposition is to be made; no notice needs to be given prior to the disposition of any portion of the Collateral that is perishable or threatens to decline speedily in value or that is of a type customarily sold on a recognized market. Notice to Persons other than a Maker claiming an interest in the Collateral shall be sent to such addresses as they have furnished to Payee;

•    If the sale is to be a public sale, Payee shall also give notice of the time and place by publishing a notice one time at least

11

5 Business Days before the date of the sale in a newspaper of general circulation in the county in which the sale is to be held;

(xii)    Payee may credit bid and purchase at any public sale; and

(xiii)    Any deficiency that exists after disposition of the Collateral as provided above will be paid immediately by Maker, which shall be a joint and several obligation. Any excess will be returned, without interest and subject to the rights of third Persons, by Payee to Maker.

(b)    The remedies of the holder hereof, as provided in this Promissory Note and in any other agreement related to this Promissory Note, shall be cumulative and concurrent, and may be pursued singularly, successively or together, at the sole discretion of the holder hereof, and may be exercised as often as occasion therefor shall arise. No act of omission or commission by the holder hereof, including specifically any failure to exercise any right, remedy or recourse provided for hereunder or under applicable law, shall be deemed to be a waiver or release of any right, remedy or recourse, such waiver or release to be effected only through a written document executed by the holder hereof. A waiver or release with reference to any one event shall not be construed as continuing, as a bar to, or as a waiver or release of, any subsequent right, remedy or recourse as to a subsequent event.

15.    **SECURITY.**  Maker hereby grants to Payee a security interest in all of its personal property in, to or under which Maker now has or hereafter acquires any right, title or interest, whether present, future or contingent (the "Collateral"), including, without limitation:

(a)    the Accounts of Maker;

(b)    the Company Books of Maker;

(c)    the Chattel Paper of Maker;

(d)    the Equipment of Maker;

(e)    the General Intangibles of Maker;

(f)    the Inventory of Maker;

(g)    the Negotiable Collateral of Maker;

(h)    all deposit accounts in which Maker has an interest and all letter-of-credit rights of Maker;

(i)    any money, or other assets of Maker that now or hereafter come into the possession, custody, or control of Maker, any other cash of Maker and any other personal property or interests in personal property of Maker of any description whatsoever, and

(j)    the proceeds and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering any or all of the Collateral, and any and all

Accounts of Maker, the Company Books of Maker, Equipment of Maker, General Intangibles of Maker, Inventory of Maker, Negotiable Collateral of Maker, goods, money, deposit accounts, or other tangible or intangible property resulting from the sale, exchange, collection, or other disposition of any of the foregoing, or any portion thereof or interest therein, and the proceeds thereof.

Maker grants a security interest in the Collateral to secure the payment or performance of following obligations of Maker: (i) Maker's obligations under this Promissory Note; (ii) all of Maker's other present and future obligations to Payee; (iii) the repayment of any amounts that Payee may advance or spend for the maintenance or preservation of the Collateral and (b) any other expenditures that Payee may make under the provisions of this Promissory Note or for the benefit of Maker; (iv) all amounts owed under any modifications, renewals or extensions of any of the foregoing obligations; (v) all other amounts now or in the future owed by Maker to Payee; and (vi) any of the foregoing that arises after the filing of a petition by or against Maker under the Bankruptcy Code, even if the obligations do not accrue because of the automatic stay under Section 362 of the Bankruptcy Code or otherwise.

Maker agrees that, from time to time, Maker shall: (i) execute all documents and take all other actions requested by the Payee to perfect any security interests in connection with this Promissory Note, and (ii) execute and record all documents, file additional financing statements, amend any existing financing statements and continuation statements and take any other actions reasonably requested by the Payee to grant a security interest in the Collateral or to perfect, further perfect, evidence or continue the rights, claims or security interest of the Payee with respect to the Collateral, including, without limitation, a pledge agreement.

Maker hereby authorizes Payee to file financing statements covering the Collateral and naming Maker as debtor and Payee as secured party in such jurisdictions as Payee deems appropriate in its sole discretion and hereby authorizes the filing of any such financing statements which may have occurred on or prior to the date hereof.

16.   **ATTORNEYS' FEES.** Upon the occurrence of an Event of Default or in the event Payee seeks legal advice in order to enforce the provisions of this Promissory Note, Maker agrees to pay all attorneys' fees incurred by Payee. If any action is brought to enforce or interpret the provisions of this Promissory Note, the prevailing party shall be entitled to a reasonable sum for attorneys' fees.

17.   **GOVERNING LAW AND SEVERABILITY.** This Promissory Note is made pursuant to, and shall be construed and governed by, the laws of the State of Arizona. If any provision of this Promissory Note is construed or interpreted by a court of competent jurisdiction to be void, invalid or unenforceable, such decision shall affect only those provisions so construed or interpreted and shall not affect the remaining provisions of this Promissory Note.

18.   **TIME OF ESSENCE.** Time is of the essence of this Promissory Note and each and every provision hereof.

19.   **PAYMENT WITHOUT OFFSET.** Principal and interest shall be paid without setoff, counterclaim or other deduction of any nature.

**20.    ASSIGNMENT.** Payee or other holder of this Promissory Note may assign all or a portion of its rights, title and interest in this Promissory Note to any person, firm, corporation or other entity without the consent of Maker.  Maker shall not assign any of its rights or obligations under this Promissory Note without the express written consent of Payee, which consent may be granted or withheld in Payee's sole discretion.

**21.    RELATIONSHIP.** The relationship of the parties hereto is that of borrower and lender and it is expressly understood and agreed that nothing contained in this Promissory Note shall be interpreted or construed to make Maker and Payee partners, joint venturers or participants in any other legal relationship except for borrower and lender.

**22.    WAIVER.** Except as set forth in this Promissory Note, to the extent permitted by applicable law, Maker, and each person who is or may become liable hereunder, waives and agrees not to assert demand, diligence, grace, presentment for payment, protest, notice of nonpayment, nonperformance, extension, dishonor, maturity, protest and default.  Payee may extend the time for payment of or renew this Promissory Note, release any party from liability hereunder, and any such extension, renewal, release or other indulgence shall not alter or diminish the liability of Maker or any other person or entity who is or may become liable on this Promissory Note except to the extent expressly set forth in a writing evidencing or constituting such extension, renewal, release or other indulgence.

**23.    HEADINGS.** The subject headings of the paragraphs of this Promissory Note are included for purposes of convenience only, and shall not affect the construction or interpretation of any of its provisions.

**24.    NO WAIVER BY PAYEE.** No delay or failure of Payee in exercising any right hereunder shall affect such right, nor shall any single or partial exercise of any right preclude further exercise thereof.

**25.    AMENDMENTS.** No amendment, modification, change, waiver, release or discharge hereof and hereunder shall be effective unless evidenced by an instrument in writing and signed by the party against whom enforcement is sought.

**26.    BINDING NATURE.** The provisions of this Promissory Note shall be binding upon Maker and the heirs, personal representatives, successors and assigns of Maker, and shall inure to the benefit of Payee and any subsequent holder of all or any portion of this Promissory Note, and their respective successors and assigns.

**27.    EVIDENCE OF INDEBTEDNESS.** This Promissory Note and the records of the Payee shall conclusively evidence the principal amount outstanding, and any accrued interest thereon, pursuant hereto.

**28.    NOTICE TO PAYEE.** Maker shall give prompt written notice to the Payee of any fact that would prohibit the making of any payment required to be made hereunder. Notwithstanding this provision or any other provision in this Promissory Note, the Payee shall not be charged with knowledge of the existence of any facts that would prohibit the making of any payment required to be made hereunder unless the Payee shall have received such written notice

14
Promissory Note and Security Agreement (December 22, 2009)

**Exhibit 1**                26

thereof; and, prior to the receipt of any such written notice, the Payee shall be entitled in all respects to assume that no such facts exist.

29.    **SAVINGS CLAUSE.**  Maker understands and believes that the terms and conditions of this Promissory Note comply with the laws of the State of Arizona, including the usury laws; however, if any interest or other charges in connection with this lending transaction are ever determined to exceed the maximum amount permitted by law, then Maker agrees that: (a) the amount of interest or charges payable pursuant to this lending transaction shall be reduced to the maximum amount permitted by law; and (b) any excess amount previously collected from Maker in connection with this transaction that exceeded the maximum amount permitted by law, will be credited against the principal balance then outstanding hereunder.  If the outstanding principal balance hereunder has been paid in full, the excess amount paid will be refunded to Maker as directed by Maker.

30.    **LEGAL REPRESENTATION.**  Maker (i) acknowledges that Payee has retained legal counsel in connection with this Promissory Note and the transactions related thereto, and (ii) confirms that it is represented by separate legal counsel in connection with this agreement and the transactions contemplated hereby.

31.    **DEFINITIONS AND CONSTRUCTION.**  Any term used in the Uniform Commercial Code and not defined in this Promissory Note has the meaning given to the term in the Uniform Commercial Code.  Capitalized terms not defined elsewhere in this Promissory Note shall have the following definitions:

(a)    "Account Debtor" means any Person who is or who may become obligated under, with respect to, or on account of, an Account.

(b)    "Accounts" has the meaning assigned thereto in the Uniform Commercial Code of the applicable jurisdiction with respect to Maker.

(c)    "Affiliate" means as to any Person, any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person, including, without limitation, any Person who is in any way related by blood or by marriage to such Person.  For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (a) vote 10% or more of the securities having ordinary voting power for the election of directors (or persons performing similar functions) of such Person or (b) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

(d)    "Benefit Plan" means a "defined benefit plan" (as defined in Section 3(35) of ERISA) for which Maker or any ERISA Affiliate has been an "employer" (as defined in Section 3(5) of ERISA) within the past six years.

(e)    "Business" shall mean the business of Maker.

(f)    "Business Day" means any day that is not a Saturday, Sunday, or other day on which national banks are authorized or required to close.

(g)    "Chattel Paper" has the meaning assigned thereto in the Uniform Commercial Code of the applicable jurisdiction with respect to Maker.

(h)    "Collateral" has the meaning assigned thereto in Section 15 hereof.

(i)    "Company Books" means, with respect to Maker, all of Maker's books and records including: ledgers; records indicating, summarizing, or evidencing Maker's properties or assets (including the Collateral of Maker) or liabilities; all information relating to Maker's business operations or financial condition; and all computer programs, disk or tape files, printouts, runs, or other computer prepared information.

(j)    "Equipment" means, with respect to Maker, all of Maker's present and hereafter acquired machinery, machine tools, motors, equipment, furniture, furnishings, fixtures, vehicles (including motor vehicles and trailers), tools, parts, goods (other than consumer goods, farm products, or Inventory), wherever located, including, (a) any interest of Maker in any of the foregoing, and (b) all attachments, accessories, accessions, replacements, substitutions, additions, and improvements to any of the foregoing.

(k)    "ERISA" means the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1000 et seq., amendments thereto, successor statutes, and regulations or guidance promulgated thereunder.

(l)    "ERISA Affiliate" means (a) any corporation subject to ERISA whose employees are treated as employed by the same employer as the employees of Maker under IRC Section 414(b), (b) any trade or business subject to ERISA whose employees are treated as employed by the same employer as the employees of Maker under IRC Section 414(c), (c) solely for purposes of Section 302 of ERISA and Section 412 of the IRC, any organization subject to ERISA that is a member of an affiliated service group of which Maker is a member under IRC Section 414(m), or (d) solely for purposes of Section 302 of ERISA and Section 412 of the IRC, any party subject to ERISA that is a party to an arrangement with Maker and whose employees are aggregated with the employees of Maker under IRC Section 414(o).

(m)    "General Intangibles" means, with respect to Maker, all of Maker's present and future general intangibles, including any payment intangibles, and other personal property (including contract rights, rights arising under common law, statutes, or regulations, chooses or things in action, goodwill, patents, trade names, trademarks, servicemarks, copyrights, blueprints, drawings, purchase orders, customer lists, monies due or recoverable from pension funds, rights to payment and other rights under any royalty or licensing agreements, infringement claims, computer programs, information contained on computer disks or tapes, literature, reports, catalogs, deposit accounts, insurance premium rebates, tax refunds, and tax refund claims), other than goods, Accounts, and Negotiable Collateral.

(n)    "Governmental Authority" means any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

(o)    "Indebtedness" means, with respect to Maker: (a) all obligations of Maker for borrowed money, (b) all obligations of Maker evidenced by bonds, debentures, notes, or other

similar instruments and all reimbursement or other obligations of Maker in respect of letters of credit, bankers acceptances, interest rate swaps, or other financial products, (c) all obligations of Maker under capital leases, (d) all obligations or liabilities of others secured by a Lien on any property or asset of Maker, irrespective of whether such obligation or liability is assumed, and (e) any obligation of Maker guaranteeing or intended to guarantee (whether guaranteed, endorsed, co-made, discounted, or sold with recourse to Maker) any indebtedness, lease, dividend, letter of credit, or other obligation of any other Person.

   (p) "Inventory" has the meaning assigned thereto in the Uniform Commercial Code of the applicable jurisdiction with respect to Maker.

   (q) "IRC" means the Internal Revenue Code of 1986, as amended, and the regulations thereunder.

   (r) "Lien" means any interest in property securing an obligation owed to, or a claim by, any Person other than the owner of the property, whether such interest shall be based on the common law, statute, or contract, whether such interest shall be recorded or perfected, and whether such interest shall be contingent upon the occurrence of some future event or events or the existence of some future circumstance or circumstances, including the lien or security interest arising from a mortgage, deed of trust, encumbrance, pledge, hypothecation, assignment, deposit arrangement, security agreement, adverse claim or charge, conditional sale or trust receipt, or from a lease, consignment, or bailment for security purposes and also including reservations, exceptions, encroachments, easements, rights-of-way, covenants, conditions, restrictions, leases, and other title exceptions and encumbrances affecting real property.

   (s) "Material Adverse Change" means (a) a material adverse change in the business, operations, results of operations, assets, liabilities or condition (financial or otherwise) of Maker, taken as a whole, or (b) the material impairment of Maker's ability (or any guarantor under any guarantee related to this Promissory Note) to perform its obligations under any agreements, notes or instruments applicable to it or of Payee to enforce the obligations under this Promissory Note or any guarantee related to this Promissory Note or realize upon the Collateral, (c) a material adverse effect on the value of the Collateral or the amount that Payee would be likely to receive (after giving consideration to delays in payment and costs of enforcement) in the liquidation of such Collateral, or (d) a material impairment of the priority of Payee's Liens with respect to the Collateral.

   (t) "Multiemployer Plan" means a "multiemployer plan" (as defined in Section 4001(a)(3) of ERISA) to which Maker or any ERISA Affiliate has contributed, or was obligated to contribute, within the past six years.

   (u) "Negotiable Collateral" means, with respect to Maker, all of Maker's present and future letters of credit, notes, drafts, instruments, investment property, security entitlements, securities, documents, personal property leases (wherein Maker is the lessor), chattel paper, and the Company Books of Maker relating to any of the foregoing.

   (v) "Person" means and includes natural persons, corporations, limited liability companies, limited partnerships, general partnerships, limited liability partnerships, joint ventures,

trusts, land trusts, business trusts, or other organizations, irrespective of whether they are legal entities, and governments and agencies and political subdivisions thereof.

        **(w)**    "<u>Plan</u>" means any employee benefit plan, program, or arrangement maintained or contributed to by Maker or with respect to which Maker may incur liability.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK – SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF,** a duly authorized representative of Maker has executed this Promissory Note as of the date set forth above.

**MAKER:**

*944 MEDIA LLC*

By: _____

Name: _____ *Marc Lotenberg* _____

Its: _____ *CEO* _____

Address Where Notices to Maker
are to be Sent:

4253 N. Scottsdale Rd., #200
Scottsdale, Arizona 85251

**GUARANTOR:**

**ML MEDIA, INC.**

By: _____

Name: _____ *Marc Lotenberg* _____

Its: _____ *CEO* _____

**ACKNOWLEDGED AND AGREED TO BY PAYEE:**

**ORBITRON HOLDINGS, LLC**

By:     Anchor Management, LLC
Its:    Manager

By: _____

Name:   Matthew Gallaher
Its:    Manager

EXHIBIT 2

| Location | Vendor Name | Vendor Address | Vendor Type | Acct # | Approximate Monthly Payment | Proposed Deposit |
|---|---|---|---|---|---|---|
| 4253 Scottsdale | Integra | PO 2966 Milwaukee wi 53201 | Inet-Server / long dist phone | 2273687-93 | 3,039.69 | 1,519.85 |
| 4253 Scottsdale | ATT All in one | PO 78522 Phx AZ 85062-8522 | Long Distance Phone | 305991893001 | 121.12 | 60.56 |
| 4253 Scottsdale | ATT 831- | PO 78045 Phx AZ 85062-8045 | I-Net | 831-000-0799-292 | 4,514.80 | 2,257.40 |
| 4253 Scottsdale | Cox | PO 78071 Phx AZ 85062-8071 | I-net & TV | 001-8501-167353402 | 275.47 | 137.74 |
| San Diego | SDG&E | PO 25111 Santa Ana CA 92799-5111 | Electric | 8275-203-007-9 | 142.74 | 71.37 |
| San Diego | ATT 619 | 800-555-5920 | phone and inet | 619-230-0944-898-5 | 319.93 | 159.97 |
| San Diego | ATT 619- | 800-750-2635 | phone and inet | 619-238-1227-440-4 | 41.79 | 20.90 |
| San Diego | COX | PO 79171 Phx AZ 85062-9171 | I-Net | 001-3110-066828401 | 45.99 | 23.00 |
| Las Vegas | ATT 831- | PO 78045 Phx AZ 85062-8045 | I-Net | 831-000-0799-292 | 708.95 | 354.48 |
| Las Vegas | XO com | File 50550 LA CA 90074-0550 | I-net | 001-00000-109741 | 795.31 | 397.66 |
| Orange County | ATT 949- | ATT Payment Center Sac. CA 95887-0001 | Local and inet | 949-252-8944-3413 | 234.81 | 117.41 |
| Orange County | ATT 857- | PO 5017 Carol Stream Il 60197-5017 | Long Distance Phone | 857-505-986 | 186.45 | 93.23 |
| Orange County | ATT 831- | PO 78045 Phx AZ 85062-8045 | I-Net | 831-000-0799-292 | 1,995.55 | 997.78 |
| Miami | FPL | General Mail Facility 33188-0001 | Electric | 35117-70053 | 114.10 | 57.05 |
| Miami | ATT 305 | PO 78522 PX. AZ 85062-8522 | Phone and inet | 0305-991893001LD | 60.36 | 30.18 |
| Miami | ATT 831- | PO 78045 Phx AZ 85062-8045 | I-Net | 831-000-0799-292 | 1,387.01 | 693.51 |
| San Fran | ATT 415 | ATT Payment Center Sac. CA 95887-0001 | Phone | 415-3419448055 | 330.40 | 165.20 |
| San Fran | ATT 831- | PO 78045 Phx AZ 85062-8045 | I-Net | 831-000-0799-292 | 762.12 | 381.06 |
| San Fran | ATT 831SF | ATT Payment Center Sac. CA 95887-0001 | I-Net | 831-000-1017-044 | 99.95 | 49.98 |
| Detroit | ATT 831- | PO 78045 Phx AZ 85062-8045 | I-Net | 831-000-0799-292 | 572.50 | 286.25 |
| Atlanta | Comcast | PO 530098 Atlanta GA 30353-0098 | I-Net | 8220-18890-4137619 | 108.22 | 54.11 |
| Dallas | Logix | PO 3608 Houston TX 77253-3608 | I-Net | 437-92000 | 1,297.15 | 648.58 |
| COLO | ATT 831- | PO 78045 Phx AZ 85062-8045 | I-Net | 831-000-0799-292 | 1,153.50 | 576.75 |
| | | | | Total | | 9,153.96 |

Exhibit 2

# EXHIBIT 3

| Location | Employee Name |
| --- | --- |
| SF | ABRAMSON, SARAH F |
| SD | AGUINALDO, KATHERINE |
| Corp | AIRO, RENEE |
| LA | APPEL, MIKE |
| National | BICKNELL, JACQUELINE |
| ATL | BROWN, JEREMY |
| LV | BULLIS, NICOLE M |
| Corp | BURY, MARTINE |
| Corp | CARPER, JENNIFER |
| MIA | CASE, HADLEY |
| MIA | CASTRO, JIANNINA |
| LV | CHARLES, SULLIVAN I |
| Corp | CHASE, CAITLYN |
| DAL | CLARK, AMY |
| LA | COPLIN, KIRA |
| ATL | COWN, AMY |
| 944.com | CROUVISIER, EMMANUEL |
| SD | DAOUST, SARAH R |
| Corp | DAVID, DEE ANNA |
| Corp | DEOCERA, ROD |
| DET | DESALVIO, NICOLE |
| OC | DICK, DEVON D |
| DET | DICKOW, CANDACE |
| Corp | FRIEDRICH, VALERIE |
| PHX | FRITCHER, ELLEN E |
| MIA | GOMEZ, RICHARD |
| Design | GONZALES, GAIL |
| ATL | HARRINGTON, KELLY |
| ATL | HARRIS, ISOUL |
| Corp | HIBBERT, MELISSA |
| ATL | HILL, DAVID ALEX |
| PHX | JOHNSON, RYAN |
| DAL | KABILIO, MELISSA |
| LA | KALLEN, ADAM |
| Corp | KAPAMADJIAN, MICHAEL |
| DET | KNAPP, JENNIFER |
| Corp | KUSHNIR, STEPHEN S |
| Corp | LANE, JODY |
| Corp | LOOK, MARIE C |
| Corp | LOTENBERG, MARC |
| PHX | MARONEY, BRITTANY |
| SF | MAY, LAUREL R |
| Corp | MELFI, MICHAEL |
| PHX | MERKOW, ERIK |
| PHX | MITCHELL, DANIEL B |
| Design | NOLAN, ANTHONY |
| DET | OJEDA, ANGEL |
| SF | ORONZI, JASON |

Exhibit 3                    33

| Location | Employee Name |
|---|---|
| Corp | PADILLA, STAR V |
| OC | PEGLER, KATHERINE |
| Design | PENZA, FELICIA |
| DAL | PITTMAN, ANDREA |
| PHX | PORTER, DARRE |
| SF | RHINEHART, ERIKA |
| SF | ROJAS, CHRIS |
| Corp | RUOTOLO, MICHAEL |
| DAL | SAFEN, PAUL |
| Corp | SALTZMAN, CHRISTOPHER M |
| LV | SHECKELLS, MELINDA |
| LA | SHILTON, ADRIANA |
| Design | SIDMAN, JONATHAN |
| LV | SKENANDORE, MICHAEL |
| DET | STEVENS, REBECCA |
| OC | TOTOLO, CHRIS |
| SD | TURNER, MARY |
| LA | VIGIL, JENNIFER |
| Corp | WATZMAN, TARYN N |
| LV | WHITE, KEITH P |
| Corp | WOLFE, CALLAIS |

**Exhibit 3**

EXHIBIT 4

| LOCATION | LAST NAME | FIRST NAME | HOURS AVAIL | $ VALUE |
|---|---|---|---|---|
| SAN FRAN | ABRAMSON | SARAH | 4.06 | 93.93 |
| SAN DIEGO | AGUINALDO | KATHERINE | 44 | 814.38 |
| CORPORATE | AIRO | RENEE | 16 | 246.14 |
| LOS ANGELES | APPEL | MICHAEL | 40 | 1442.25 |
| NATIONAL | BICKNELL | JACQUELIN | 116.68 | 673.13 |
| ATLANTA | BROWN | JEREMY | 36 | 761.51 |
| LAS VEGAS | BULLIS | NICOLE | 10.19 | -221.61 |
| CORPORATE | BURY | MARTINE | 18 | 824.25 |
| CORPORATE | CARPER | JENNIFER | 6 | 86.54 |
| MIAMI | CASE | HADLEY | 26 | 481.23 |
| LAS VEGAS | CHARLES | SULLIVAN | 132.7 | 2578.93 |
| CORPORATE | CHASE | CAITLYN | 2 | 36.54 |
| LOS ANGELES | COPLIN | KIRA | 24 | 599.98 |
| 944.COM | CROUVISIER | EMMANUEL | 26 | 674.97 |
| SAN DIEGO | DAOUST TROMB | SARAH | 145.66 | 3167.78 |
| CORPORATE | DAVID | DEE ANNA | -16 | -606.52 |
| DETROIT | DESALVIO | NICOLE | 14 | 302.87 |
| ORANGE CO | DICK | DEVON | 22 | 126.92 |
| DETROIT | DICKOW | CANDACE | 22 | 126.92 |
| CORPORATE | FRIEDRICH | VALERIE | 4 | 76.92 |
| PHOENIX | FRITCHER | ELLEN | 6 | 115.38 |
| MIAMI | GOMEZ | RICHARD | 10 | 57.69 |
| CORPORATE | GONZALES | GAIL | 6 | 245.18 |
| ATLANTA | HARRIS | ISOUL | 16 | 361.52 |
| CORPORATE | HIBBERT | MELISSA | 16 | 384.6 |
| ATLANTA | HILL | DAVID | 2 | 57.69 |
| PHOENIX | JOHNSON | RYAN | 12 | 69.23 |
| DALLAS | KABILIO | MELISSA | 4 | 65.38 |
| LOS ANGELES | KALLEN | ADAM | 6 | 115.38 |
| CORPORATE | KAPAMADJIAN | MICHAEL | 12 | 230.76 |
| DETROIT | KNAPP | JENNIFER | -8 | -230.76 |
| CORPORATE | KUSHNIR | STEPHEN | -36 | -1546.82 |
| CORPORATE | LANE | JODY | 32 | 884.8 |
| CORPORATE | LOOK | MARIE | -4 | -76.92 |
| CORPORATE | LOTENBERG | MARC | 250 | 7812.19 |
| PHOENIX | MARONEY | BRITTANY | 18 | 259.61 |
| SAN FRAN | MAY | LAUREL | 38 | 914.34 |
| CORPORATE | MELFI | MICHAEL | 30 | 504.72 |
| PHOENIX | MERKOW | ERIK | 48 | 1384.56 |
| PHOENIX | MITCHELL | DANIEL | 73.62 | 2300.53 |
| CORPORATE | NOLAN | ANTHONY | -12 | -201.91 |
| DETROIT | OJEDA | ANGEL | 26 | 149.99 |
| SAN FRAN | ORONZI | JASON | 23.36 | 218.99 |
| CORPORATE | PADILLA | STAR | -12 | -222.1 |
| ORANGE CO | PEGLER | KATHERINE | 58.68 | 1357.63 |
| CORPORATE | PENZA | FELICIA | 0 | 0 |
| DALLAS | PITTMAN | ANDREA | 4 | 67.3 |
| PHOENIX | PORTER | DARRE | 2 | 28.85 |
| SAN FRAN | ROJAS | CHRIS | 6 | 193.26 |
| CORPORATE | RUOTOLO | MICHAEL | -8 | -384.6 |
| DALLAS | SAFEN | PAUL | 4 | 125 |

**Exhibit 4**

| LAS VEGAS | SHECKELLS | MELINDA | | 32 | 692.28 |
|---|---|---|---|---|---|
| LOS ANGELES | SHILTON | ADRIANA | | 16 | 230.76 |
| CORPORATE | SIDMAN | JONATHAN | | 4 | 92.54 |
| LAS VEGAS | SKENANDORE | MICHAEL | | 42 | 1817.24 |
| DETROIT | STEVENS | REBECCA | | 16 | 384.6 |
| ORANGE CO | TOTOLO | CHRISTOP | | 38 | 219.22 |
| SAN DIEGO | TURNER | MARY | | 2 | 33.65 |
| LOS ANGELES | VIGIL | JENNIFER | | 16 | 346.14 |
| CORPORATE | WATZMAN | TARYN | | 32 | 692.28 |
| LAS VEGAS | WHITE | KEITH | | 172.1 | 4578.93 |
| CORPORATE | WOLFE | CALLAIS | | 4 | 53.84 |

**Exhibit 4**

36

EXHIBIT 5

Cash Flow Detail

1

| | 12-Apr 16-Apr | 19-Apr 23-Apr | 26-Apr 30-Apr | May-10 | Jun-10 | Jul-10 | Aug-10 |
|---|---|---|---|---|---|---|---|
| Total Cash Receipts | 243,450 | 170,116 | 170,116 | 850,000 | 850,000 | 865,000 | 875,000 |
| | | | | | | | |
| 50000 · Expense | | | | | | | |
| 50100 · Payroll | | | | | | | |
| 50105 · Other Comp | | | | - | - | - | - |
| 50110 · Salaries | 150,000 | | 150,000 | 325,000 | 325,000 | 325,000 | 325,000 |
| 50199 · Payroll Allocation | | | | - | - | - | - |
| Total 50100 · Payroll | 150,000 | - | 150,000 | 325,000 | 325,000 | 325,000 | 325,000 |
| | | | | | | | |
| 50200 · Other Incentive | | | | | | | |
| 50205 · Sales Commission | 36,794 | | | 31,594 | 35,000 | 35,000 | 35,000 |
| 50210 · Sales Bonus | 2,078 | | | 2,020 | 2,782 | 2,726 | 2,627 |
| 50215 · sales override | 7,083 | | | 7,083 | 7,083 | 7,083 | 7,083 |
| 50299 · Incentives Allocation | | | | - | - | - | - |
| Total 50200 · Other Incentive | 45,955 | - | - | 40,697 | 44,865 | 44,809 | 44,710 |
| | | | | | | | |
| 50300 · Other Beneftis | | | | | | | |
| 50305 · Medical Ins | 2,520 | | 2,520 | 5,310 | 5,465 | 5,503 | 5,582 |
| 50320 · FUTA | 137 | | 137 | 350 | 405 | 409 | 430 |
| 50325 · SUTA | 1,004 | | 504 | 1,789 | 2,176 | 2,175 | 2,314 |
| 50330 · FICA | 12,521 | | 6,709 | 21,138 | 22,977 | 23,281 | 24,059 |
| 50335 · Workers Comp | 1,051 | | 1,051 | 2,319 | 2,837 | 2,833 | 3,007 |
| 50340 · 401K Matching | - | | - | - | - | - | - |
| 50360 · Moving Expenses | - | | - | - | - | - | - |
| 50370 · Company Car | 2,379 | | 2,379 | 4,758 | 4,758 | 4,758 | 4,758 |
| 50375 · NV Tax | 339 | | 339 | 678 | 678 | 678 | 678 |
| 50380 · Housing Allowance | - | | - | - | - | - | - |
| 50399 · Employee Benefits Allocation | - | | - | - | - | - | - |
| Total 50300 · Other Beneftis | 19,951 | - | 13,638 | 36,344 | 39,296 | 39,638 | 40,827 |
| | | | | | | | |
| 50400 · Other Production | | | | | | | |
| 50410 · Printing | | | 185,000 | 207,184 | 185,000 | 185,000 | 201,217 |
| 50415 · Freight | | | 13,881 | 14,000 | 13,881 | 13,881 | 14,000 |
| 50420 · Print Postage | | | 85 | 85 | 85 | 85 | 85 |
| 50425 · Distribution | | | 22,500 | 22,500 | 22,500 | 22,500 | 22,500 |
| 50430 · Racks | | | - | - | - | - | - |
| 50499 · Dist Allocation | | | - | - | - | - | - |
| Total 50400 · Other Production | - | - | 221,466 | 243,769 | 221,466 | 221,466 | 237,803 |
| | | | | | | | |
| 50500 · Other Travel and Entertainment | | | | | | | |
| 50505 · Gifts | | | | | | | |
| 50510 · Auto Mileage | 500 | | 500 | 1,000 | 1,000 | 1,000 | 1,000 |
| 50515 · Travel Lodging | 678 | | 678 | 2,535 | 2,535 | 2,535 | 2,535 |
| 50520 · Travel Air Fare | 2,500 | | 2,500 | 5,000 | 5,000 | 5,000 | 5,000 |
| 50525 · Travel Car Rental | - | | - | | | | |
| 50530 · Taxi | 267 | | 267 | 725 | 725 | 725 | 725 |
| 50535 · Parking | 250 | | 250 | 500 | 500 | 500 | 500 |
| 50540 · Meals | 3,750 | | 3,750 | 7,500 | 7,500 | 7,500 | 7,500 |
| 50545 · Entertainment | 3,750 | | 3,750 | 7,500 | 7,500 | 7,500 | 7,500 |
| 50550 · Conventions | - | | - | - | - | - | - |
| 50599 · T&E Allocation | - | | - | - | - | - | - |
| Total 50500 · Other Travel and Entertainment | 11,695 | - | 11,695 | 24,759 | 24,759 | 24,759 | 24,759 |
| | | | | | | | |
| 50600 · Other Outside Help | | | | | | | |
| 50605 · Other Prof Services | | | | 1,427 | 1,427 | 1,427 | 1,427 |
| 50610 · Training | | | | 7,500 | 15,000 | - | - |
| 50615 · Temporary Help | | | | 10,000 | 5,000 | - | - |
| 50620 · Consulting | 12,375 | | 12,375 | 24,751 | 24,751 | 24,751 | 24,751 |

Exhibit 5                          37                          Page 0 of 4

Cash Flow Detail

1

| | 12-Apr 16-Apr | 19-Apr 23-Apr | 26-Apr 30-Apr | May-10 | Jun-10 | Jul-10 | Aug-10 |
|---|---|---|---|---|---|---|---|
| 50625 · Outsourcing | 848 | | 848 | 1,696 | 1,696 | 1,696 | 1,696 |
| 50630 · Accounting | | | 834 | 834 | 834 | 834 | 834 |
| 50635 · Auditing | | | 956 | 956 | 956 | 956 | 956 |
| 50640 · Legal | 2,500 | | 2,500 | 5,000 | 5,000 | 5,000 | 5,000 |
| 50699 · Outside Help Allocation | - | | - | - | - | - | - |
| Total 50600 · Other Outside Help | 15,723 | - | 17,513 | 52,163 | 54,663 | 34,663 | 34,663 |
| | | | | | | | |
| 50700 · Other Promotion | | | | | | | |
| 50705 · Other Promo | 250 | 250 | 250 | 1,000 | 1,000 | 1,000 | 1,000 |
| 50720 · Promo Printing | 250 | 250 | 250 | 1,000 | 1,000 | 1,000 | 1,000 |
| 50725 · Promo Supplies | 188 | 188 | 188 | 750 | 750 | 750 | 750 |
| 50730 · Promo Service | 127 | 127 | 127 | 507 | 507 | 507 | 507 |
| 50735 · Market Research | 125 | 125 | 125 | 500 | 500 | 500 | 500 |
| 50745 · Banner & Signage | - | - | - | - | - | - | - |
| 50700 · Other Promotion - Other | - | - | - | - | - | - | - |
| 50799 · Promo/Mkgt Allocation | - | - | - | - | - | - | - |
| Total 50700 · Other Promotion | 939 | 939 | 939 | 3,757 | 3,757 | 3,757 | 3,757 |
| | | | | | | | |
| 50800 · Other Freelance | | | | | | | |
| 50805 · Models | | | | | | | |
| 50810 · Stylist / Makeup | | | | - | - | - | - |
| 50815 · Freelance Writers | 1,762 | 1,762 | 1,762 | 2,500 | 7,047 | 7,047 | 8,047 |
| 50820 · Freelance Photographers | 3,933 | 3,933 | 3,933 | 10,000 | 15,732 | 15,732 | 16,732 |
| 50840 · Wire Service | 46 | 46 | 46 | 184 | 184 | 184 | 184 |
| 50845 · Freelance Designers | - | - | - | - | - | - | - |
| 50800 · Other Freelance - Other | - | - | - | - | - | - | - |
| 50899 · Freelance Allocation | - | - | - | - | - | - | - |
| Total 50800 · Other Freelance | 5,741 | 5,741 | 5,741 | 12,684 | 22,962 | 22,962 | 24,962 |
| | | | | | | | |
| 50900 · Other Info & Technology | | | | | | | |
| 50905 · IT Hosting | 3,500 | | | 3,500 | 3,500 | 3,500 | 3,500 |
| 50910 · Computer Hardware Exp | | | 120 | 120 | 120 | 120 | 120 |
| 50915 · Computer Software Exp | | | | | | | |
| 50920 · Computer Hardware Leased | | | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| 50930 · Tech R&M | 2,500 | | 2,500 | - | - | - | - |
| 50935 · Hardward Service Contracts | | | | - | - | - | - |
| 50940 · Software Service Contracts | | | | 1,500 | 1,500 | 1,500 | 1,500 |
| 50999 · Info & Tech Allocation | | | | - | - | - | - |
| Total 50900 · Other Info & Technology | | | | 7,120 | 7,120 | 7,120 | 7,120 |
| | | | | | | | |
| 51000 · Other Premises | | | | | | | |
| 51005 · Office Storage | 1,057 | | | 1,057 | 500 | 500 | 500 |
| 51010 · Rent Lease | 18,375 | | | 11,051 | 28,909 | 28,909 | 40,000 |
| 51015 · Common Area Maint | 3,464 | | | 2,900 | 2,900 | 2,900 | 2,900 |
| 51020 · Office Equip Rental / Lease | 1,000 | | | 1,000 | 1,000 | 1,000 | 1,000 |
| 51025 · Electricity | 4,071 | | | 4,072 | 4,073 | 4,074 | 4,075 |
| 51030 · Water | 165 | | | 165 | 165 | 165 | 165 |
| 51035 · Telephone Equip | 135 | | | 135 | 135 | 135 | 135 |
| 51040 · Local Telephone Bills | 4,123 | | | 3,979 | 3,979 | 3,979 | 3,979 |
| 51045 · Long Distance Phone Bills | 1,239 | | | 735 | 735 | 735 | 735 |
| 51050 · Premises R&M | 392 | | | 367 | 367 | 367 | 367 |
| 51055 · Janitorial | 261 | 261 | 261 | 1,045 | 1,045 | 1,045 | 1,045 |
| 51060 · Security | 191 | | | 191 | 191 | 191 | 191 |
| 51065 · Gas | - | | | - | - | - | - |
| 51070 · Parking | 496 | | | 496 | 496 | 496 | 496 |
| 51075 · Cable / Internet | | 6,000 | | 6,000 | 6,000 | 6,000 | 6,000 |
| 51099 · Premises Allocation | - | | | | | | |
| Total 51000 · Other Premises | 34,968 | 6,261 | 261 | 33,193 | 50,495 | 50,496 | 61,588 |

Exhibit 5                38                Page 1 of 4

Cash Flow Detail

1

| | 12-Apr 16-Apr | 19-Apr 23-Apr | 26-Apr 30-Apr | May-10 | Jun-10 | Jul-10 | Aug-10 |
|---|---|---|---|---|---|---|---|
| 51100 · Other Office Expense | | | | | | | |
| 51105 · Office Supplies | 607 | 607 | 607 | 2,321 | 2,321 | 2,321 | 2,321 |
| 51110 · Local Mtgs/In-House Meals | 125 | 125 | 125 | 500 | 500 | 500 | 500 |
| 51115 · Dues & Subs | 86 | 86 | 86 | 345 | 345 | 345 | 345 |
| 51120 · Office Postage | 504 | 504 | 504 | 1,946 | 1,946 | 1,946 | 1,946 |
| 51199 · Office Expense Allocation | - | - | - | - | - | - | - |
| Total 51100 · Other Office Expense | 1,322 | 1,322 | 1,322 | 5,112 | 5,112 | 5,112 | 5,112 |
| | | | | | | | |
| 51200 · Bad Debt Expenses | | | | | | | |
| 51205 · Bad Debt Expense | | | | | | | |
| 51299 · Bad Debt Expense Allocation | | | | - | - | - | - |
| Total 51200 · Bad Debt Expenses | | | | - | - | - | - |
| | | | | | | | |
| 51300 · Other Insurance | | | | | | | |
| 51305 · Liability Insurance | | | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
| 51315 · Auto Insurance | | | | - | - | - | - |
| 51399 · Insurance Exp Allocation | | | | - | - | - | - |
| Total 51300 · Other Insurance | - | - | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
| | | | | | | | |
| 51400 · Miscellaneous | | | | | | | |
| 51405 · Fashion Shoot Miscel | | | | - | - | - | - |
| 51410 · Collection Fees | | 67 | | 67 | 67 | 67 | 67 |
| 51415 · Credit Card Service Charges | | 4,430 | | 4,430 | 4,430 | 4,430 | 4,430 |
| 51420 · Bank Expense | | 900 | | 900 | 900 | 900 | 900 |
| 51425 · Licenses Permits | | | 340 | 340 | 340 | 340 | 340 |
| 51430 · Other Taxes | | | 1,038 | 1,038 | 1,038 | 1,038 | 1,038 |
| 51440 · Events | | | | - | - | - | - |
| 51450 · Miscellaneous | | | 3,408 | 3,408 | 3,408 | 3,408 | 3,408 |
| 51455 · Membership Fees | | | 527 | 527 | 527 | 527 | 527 |
| 51490 · Suspense Account | | | - | - | - | - | - |
| 51499 · Miscellaneous Allocation | | | (0) | (0) | (0) | (0) | (0) |
| Total 51400 · Miscellaneous | - | 5,396 | 5,313 | 10,710 | 10,710 | 10,710 | 10,710 |
| | | | | | | | |
| 51500 · Depreciation Expense | | | | | | | |
| 51505 · Depreciation | | | | | | | |
| 51599 · Depreciation Allocation | | | | - | - | - | - |
| Total 51500 · Depreciation Expense | | | | - | - | - | - |
| | | | | | | | |
| 51600 · Interest Expense | | | | | | | |
| 51605 · Interest Exp | | | | - | - | - | - |
| 51699 · Interest Expense Allocation | | | | - | - | - | - |
| Total 51600 · Interest Expense | | | | - | - | - | - |
| | | | | | | | |
| 51700 · Profit Share | | | | - | - | 82,043 | - |
| 51705 · Profit Share | | | | - | - | - | - |
| Total 51700 · Profit Share | | | | - | - | 82,043 | - |
| | | | | | | | |
| Total 50000 · Expense | 286,293 | 19,659 | 430,389 | 797,808 | 812,706 | 875,037 | 823,511 |
| | | | | 0 | 0 | 0 | 0 |
| Net Cash From Operations | (42,843) | 150,457 | (260,273) | 52,192 | 37,294 | (10,037) | 51,489 |
| | | | | | | | |
| Capital Equipment | | | 7,500 | 20,000 | 15,000 | 5,000 | 5,000 |
| Legal | | | | | | 35,000 | - |
| Court Costs Other Fees/credit committee | | | | - | 6,000 | 6,000 | 6,000 |
| Rent Deposits | | | | 15,000 | - | - | - |
| Utility Deposits | 21,000 | | | | | | |
| Capital Leases | | | | - | - | - | - |

Exhibit 5          39          Page 2 of 4

Cash Flow Detail

1

| | 12-Apr 16-Apr | 19-Apr 23-Apr | 26-Apr 30-Apr | May-10 | Jun-10 | Jul-10 | Aug-10 |
|---|---|---|---|---|---|---|---|
| CIT Technology Nov-10 | | | | 1,482 | 1,482 | 1,482 | 1,482 |
| GE Capital Aug-11 | | | | 2,824 | 2,824 | 2,824 | 2,824 |
| Var Resources Aug-11 | | | | 2,729 | 2,729 | 2,729 | 2,729 |
| Insight Global Finance Oct-11 | | | | 918 | 918 | 918 | 918 |
| HP Jul-10 | | | | 989 | 989 | 989 | - |
| | | | | | | | |
| Total Non Operating Cash Disbursements | 21,000 | - | 7,500 | 43,942 | 29,942 | 54,942 | 18,953 |
| | | | | | | | |
| Net Cash Flow | (63,843) | 150,457 | (267,773) | 8,250 | 7,352 | (64,979) | 32,536 |
| | | | | | | | |
| Cumulative Net Cash Flow | (63,843) | 86,613 | (181,160) | (172,909) | (165,558) | (230,537) | (198,001) |
| | | | | | | | |
| Payout Liabilities | | | | | - | | (30,000) |
| | | | | | | | |
| Net Cash After Payout Liabilities | (63,843) | 150,457 | (267,773) | 8,250 | 7,352 | (64,979) | 2,536 |
| Dip Financing | 250,000 | | | 50,000 | 50,000 | 50,000 | - |
| Adjusted Net Cash | 186,157 | 150,457 | (267,773) | 58,250 | 57,352 | (14,979) | 2,536 |
| | | | | | | | |
| Cumulative Net Cash Flow | 186,157 | 336,613 | 68,840 | 127,091 | 184,442 | 169,463 | 171,999 |

Exhibit 5                40                Page 3 of 4